# IN THE SUPREME COURT OF TEXAS

══════════
No. 18-1022
══════════

MARK SILGUERO AND AMY WOLFE, APPELLANTS,

v.

CSL PLASMA, INCORPORATED, APPELLEE

══════════════════════════════════
ON CERTIFIED QUESTIONS FROM THE UNITED STATES
COURT OF APPEALS FOR THE FIFTH CIRCUIT
══════════════════════════════════

**Argued March 13, 2019**

JUSTICE GREEN delivered the opinion of the Court.

In this opinion we consider two questions certified to this Court by the Fifth Circuit Court of Appeals: (1) Is a plasma collection center a "public facility" under Texas Human Resources Code (THRC) section 121.002(5), and if so, (2) what standard applies for determining whether a public facility's rejection of a person with a disability constitutes impermissible discrimination under the THRC? We hold that a plasma collection center is a "public facility" under section 121.002(5). We further hold that a plasma collection center may reject a person with a disability—eliminating their opportunity to donate plasma and receive compensation—without committing impermissible discrimination under section 121.003(a) when: (1) the plasma center's rejection does not meet the THRC's definition of "discrimination" or satisfies an exception to the definition of "discrimination," such as the application of eligibility criteria that screen out persons with disabilities, but are shown

to be necessary for the provision of services; or (2) the defendant establishes that allowing the person with a disability full use and enjoyment of the public facility would pose a direct threat to the health or safety of others.  *See* 42 U.S.C. § 12182(b)(2)(A)(i), (b)(3).

## I. Background

CSL Plasma, Inc. operates plasma collection centers across the United States.  At these centers, CSL extracts the donor's blood, separates the donor's plasma from the red blood cells, and then returns the red blood cells to the donor's bloodstream.[1]  After this extraction process, CSL compensates the donor,[2] processes the plasma to create a marketable plasma byproduct, and ultimately sells this byproduct to pharmaceutical companies.  The federal Food and Drug Administration (FDA) regulates this plasma extraction process.  The FDA licenses and audits plasma collection centers. Under the FDA's regulations, CSL must screen all potential donors to determine whether each individual is eligible to donate.  *See* 21 C.F.R. § 630.10.  During the screening, potential donors answer health-related questions, and CSL's medical staff, referring to CSL's medical guidelines, determine their eligibility by checking their vital signs and considering their medical history, current medications, and whether they have recent tattoos.  For example, CSL's medical guidelines on eligibility provide that if a potential donor suffers from anxiety requiring the use of a

---

[1] Both the district court and the Fifth Circuit Court of Appeals are cautious about using the words "donate" or "donor" in this context because the individuals (or donors) receive compensation for supplying their plasma and are therefore not making a donation in the ordinary sense of the term.  *See* 907 F.3d 323, 325 n.1 (5th Cir. 2018).  This opinion uses the term "donor" and similar words, as the Fifth Circuit did, to follow the terminology in the plasma industry, and it refers to the facilities at issue as "plasma collection centers," as the Fifth Circuit did.

[2] Amicus curiae Plasma Protein Therapeutics Association, whose members operate more than 750 plasma collection centers, makes a point to say that plasma collection centers do not pay donors for their plasma; rather, the "compensation is for their time and inconvenience, not a quid pro quo for their plasma."

service dog, he or she is ineligible to donate. CSL's medical staff is permitted to contact CSL physicians to discuss particular potential donors. Individuals who fail the screening are deferred, meaning they are not permitted to donate and receive no compensation. Mark Silguero and Amy Wolfe were potential donors at CSL.

Silguero suffers from bad knees and uses a cane. CSL and Silguero agree that Silguero qualifies as a person with disabilities under the Americans with Disabilities Act (ADA) and the THRC. Silguero had previously donated plasma at CSL between January and April 2014. Silguero attempted to donate again on January 2, 2015. At that time, the condition of Silguero's knees had worsened to the point of needing knee replacements. Silguero went through CSL's donor-screening process, and CSL informed him that he would be deferred and unable to donate that day. Silguero claims he was deferred because of his "unsteady gait" and because CSL believed that he could not transfer safely to and from the donation bed. Silguero became upset, shook his finger at the medical staff, and told them they would be sorry. As a result, CSL deferred Silguero permanently, banning him from donating at CSL.

Wolfe suffers from an anxiety disorder and utilizes a service dog to improve her symptoms. Having never donated at CSL before, Wolfe went to CSL to donate plasma on October 9, 2016. Both CSL and Wolfe agree that Wolfe qualifies as a person with a disability under the ADA and the THRC. CSL did not allow Wolfe to donate because she required a service animal to treat her anxiety. In deferring her, CSL relied on its guidelines that a person is ineligible to donate if they suffer from anxiety requiring the use of a service dog.

3

Silguero filed suit against CSL in federal court on August 24, 2016, alleging unlawful discrimination on the basis of his disability. He sought injunctive relief under Title III of the ADA and both injunctive relief and damages under chapter 121 of the THRC. The district court allowed Wolfe to intervene as a plaintiff on March 28, 2017, because her claims against CSL for disability discrimination presented common questions of fact and law. On August 14, 2017, each side moved for summary judgment. CSL argued that it was neither a place of "public accommodation" under the ADA, because it did not qualify as a "service establishment," nor a "public facility" under the THRC. It further asserted that Silguero and Wolfe (collectively, the "plaintiffs") could not establish a genuine issue of material fact as to whether CSL fell under the ADA or THRC. The plaintiffs argued that a plasma collection center falls within the plain meaning of "service establishment" under the ADA because it is simply an establishment that provides a service. The plaintiffs cited a Tenth Circuit Court of Appeals case in support of this argument. *See Levorsen v. Octapharma Plasma, Inc.*, 828 F.3d 1227, 1234 (10th Cir. 2016) (holding that a plasma collection center was a "service establishment" under the ADA). Under the THRC, the plaintiffs argued that a plasma collection center qualifies as a retail business and commercial establishment to which the general public is invited or, alternatively, as an "other place of public accommodation."

The district court granted summary judgment in favor of CSL. No. 2:16-CV-361, 2017 WL 6761818, at *1 (S.D. Tex. Nov. 3, 2017) (slip copy). The district court first concluded that a plasma collection center is not a place of "public accommodation" under section 12181(7) of the ADA. *Id.* at *4. The court reasoned that plasma collection centers are not "other service establishment[s]"

4

under section 12181(7)(F) because they pay donors for their plasma rather than offering a service in exchange for compensation. *Id.*

Having decided that the ADA does not apply, the district court elected to maintain supplemental jurisdiction over the plaintiffs' state law claims. *See id.* at *5 (citing *Baker v. Farmers Elec. Coop., Inc.*, 34 F.3d 274, 283 (5th Cir. 1994)). Explaining that the THRC provides for persons with disabilities to have full use and enjoyment of a public facility in Texas, the court analyzed whether a plasma collection center falls within the meaning of "public facility" under the THRC. *Id.*; *see also* TEX. HUM. RES. CODE § 121.003(a). The court looked to the plain meaning of "public facility" under the THRC, concluding that a plasma collection center does not qualify as a public facility because it is not a place of public accommodation under section 121.002(5). 2017 WL 6761818, at *5. Specifically, the court reasoned:

> [A] plasma-donation center does not supply any good or service for convenience or need. Rather, the donor sells blood plasma to the center. Because the roles of seller and buyer are reversed in the plasma-donation context, plasma-donation centers such as CSL do not qualify as places of public accommodation under Texas Human Resources Code § 121.002(5).

*Id.* The district court also reasoned that the public is not generally invited to a plasma collection center. *Id.* at *6. It noted that although a plasma collection center is arguably a commercial business, it only purchases plasma from those who pass the screening, and it does not invite the general public, in its entirety, to donate; "[a]t most, it invites the general public to find out whether they meet the criteria for donating." *Id.* Therefore, the district court determined that a plasma collection center does not represent the open and accessible nature of the establishments listed in section 121.002(5) and could not be considered a public facility under the THRC. *Id.*

5

The Fifth Circuit affirmed the district court's holding that a plasma collection center is not an "other service establishment" under the ADA. 907 F.3d 323, 332 (5th Cir. 2018). After concluding that the ADA does not apply to a plasma collection center, the Fifth Circuit certified questions to this Court as to whether the THRC governs plasma collection centers such as CSL's. *Id.* at 333. Those questions are:

> 1. Is a plasma collection center [like those operated by CSL] a "public facility" under Texas Human Resources Code § 121.002(5)?

> 2. If so, would Texas law allow the plasma collection center to reject a "person with a disability," *see* TEX. HUM. RES. CODE § 121.002(4), based on the center's concerns for the individual's health that stem from the disability? What standard would apply to determining whether the plasma collection center properly rejected the person, rather than committed impermissible discrimination under Texas Human Resources Code § 121.003(a)?

*Id.* We accepted the certified questions. 62 Tex. Sup. Ct. J. 90 (Oct. 26, 2018).

## II. Texas Human Resources Code Chapter 121

Chapter 121 of the THRC, which was enacted before and differs substantially from its federal counterpart in the ADA, embodies the purpose of "encourag[ing] and enabl[ing] persons with disabilities to participate fully in the social and economic life of the state, to achieve maximum personal independence, . . . and use all public facilities available within the state." TEX. HUM. RES. CODE § 121.001; *see also* Americans with Disabilities Act of 1990, Pub. L. No. 101-336, 104 Stat. 327 (codified at 42 U.S.C. ch. 126); Act of May 20, 1969, 61st Leg., R.S., ch. 416, 1969 Tex. Gen. Laws 1374 (codified at TEX. HUM. RES. CODE ch. 121). The Legislature has instructed that the provisions of THRC chapter 121 are to be "construed in a manner compatible with other state laws relating to persons with disabilities." TEX. HUM. RES. CODE § 121.009. Additionally, the statute

6

"shall be liberally construed to achieve [its] purpose and to promote justice."  TEX. GOV'T CODE

§ 312.006(a).

The THRC provides that "[p]ersons with disabilities have the same right as persons without

disabilities to the full use and enjoyment of any *public facility* in the state."  TEX. HUM. RES. CODE

§ 121.003(a) (emphasis added).  Specifically:

> (c) No person with a disability may be denied admittance to any *public facility* in the
> state because of the person's disability.  No person with a disability may be denied the
> use of a white cane, assistance animal, wheelchair, crutches, or other device of
> assistance.
>
> (d) The discrimination prohibited by this section includes a refusal to allow a person
> with a disability to use or be admitted to any *public facility*, a ruse or subterfuge
> calculated to prevent or discourage a person with a disability from using or being
> admitted to a *public facility*, and a failure to:
> > (1) comply with Chapter 469, Government Code;
> > (2) make reasonable accommodations in policies, practices, and procedures;
> > or
> > (3) provide auxiliary aids and services necessary to allow the full use and
> > enjoyment of the *public facility*.

*Id.* § 121.003(c), (d)(1)–(3) (emphasis added).  The THRC defines "public facility" as including:

> a street, highway, sidewalk, walkway, common carrier, airplane, motor vehicle,
> railroad train, motor bus, streetcar, boat, or any other public conveyance or mode of
> transportation; a hotel, motel, or other place of lodging; a public building maintained
> by any unit or subdivision of government; a retail business, commercial
> establishment, or office building to which the general public is invited; a college
> dormitory or other educational facility; a restaurant or other place where food is
> offered for sale to the public; and any other place of public accommodation,
> amusement, convenience, or resort to which the general public or any classification
> of persons from the general public is regularly, normally, or customarily invited.

*Id.* § 121.002(5).  A "person with a disability" is a person who has "a mental or physical disability,"

"an intellectual or developmental disability," "a hearing impairment," "deafness," "a speech

7

impairment," "a visual impairment," "post-traumatic stress disorder," or "any health impairment that requires special ambulatory devices or services." *Id.* § 121.002(4)(A)–(H).

The THRC expressly requires that persons with disabilities have the same use and enjoyment of "public facilities" as non-disabled persons—more specifically, a public facility cannot deny admittance to a person with a disability because of his or her disability, deny a person with a disability use of a device of assistance, such as an assistance animal, and must make reasonable accommodations in policies, practices, and procedures, providing support and services to allow the person with a disability full use and enjoyment of the facility. *Id.* § 121.003(a), (c), (d)(1)–(3).

In answering certified questions, we are limited to answering only the questions before us. *See, e.g.*, *Amberboy v. Societe de Banque Privee*, 831 S.W.2d 793, 798 (Tex. 1992) ("[A] certified question is a limited procedural device that constrains us to answer only the question certified 'and nothing more.'" (citation omitted)). Both certified questions present issues of statutory interpretation of THRC chapter 121.[3] We review issues of statutory construction de novo. *E.g.*, *Harris Cty. Appraisal Dist. v. Tex. Workforce Comm'n*, 519 S.W.3d 113, 118 (Tex. 2017) (citations omitted); *Molinet v. Kimbrell*, 356 S.W.3d 407, 411 (Tex. 2011) (citation omitted). In construing statutes, our primary objective is to give effect to the Legislature's intent. *E.g.*, *Lippincott v. Whisenhunt*, 462 S.W.3d 507, 509 (Tex. 2015) (per curiam) (citation omitted); *Molinet*, 356 S.W.3d at 411 (citation omitted). "It is the Legislature's prerogative to enact statutes; it is the judiciary's responsibility to interpret those statutes according to the language the Legislature used, absent a context indicating

---

[3] To answer only the questions certified to us, we must not consider the facts relating to the plaintiffs or to CSL, and we instead must decide, as a general matter, whether a plasma collection center qualifies as a public facility, recognizing that the structure of plasma collection centers and their policies can vary.

a different meaning or the result of the plain meaning of the language yielding absurd or nonsensical results." *Molinet*, 356 S.W.3d at 414–15 (citing TEX. GOV'T CODE § 311.011(a), which explains that words and phrases shall be read in context and construed according to rules of grammar and common usage).

In interpreting statutes, we must look to the plain language, construing the text in light of the statute as a whole. *See id.* at 411 (citation omitted); *see also Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 572 (Tex. 2016) (citation omitted). A statute's plain language is the most reliable guide to the Legislature's intent. *See Sullivan v. Abraham*, 488 S.W.3d 294, 299 (Tex. 2016) (quoting *Prairie View A&M Univ. v. Chatha*, 381 S.W.3d 500, 507 (Tex. 2012)). The statutory terms bear their common, ordinary meaning, unless the text provides a different meaning or the common meaning leads to an absurd result. *See Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 838 (Tex. 2018) (citation omitted). This Court may not impose its own judicial meaning on a statute by adding words not contained in the statute's language. *See Lippincott*, 462 S.W.3d at 508. If the statute's plain language is unambiguous, we interpret its plain meaning, presuming that the Legislature intended for each of the statute's words to have a purpose and that the Legislature purposefully omitted words it did not include. *See id.* at 509 (citation omitted); *Janvey*, 487 S.W.3d at 572 (reviewing a certified question and explaining that the Court's "primary objective in construing a statute is to ascertain and effectuate the Legislature's intent without unduly restricting or expanding the statute's scope" (citation omitted)). The statutory words must be determined considering the context in which they are used, not in isolation. *See Greater Hous. P'ship v. Paxton*, 468 S.W.3d 51, 59 (Tex. 2015) (citations omitted).

9

### III.  "Public Facility" Under the Texas Human Resources Code

We begin by considering the first certified question:  Is a plasma collection center a "public facility" under THRC section 121.002(5)?  The plaintiffs argue that a plasma collection center, such as those operated by CSL, qualifies as a "public facility" under the THRC.  Specifically, the plaintiffs argue that a plasma collection center invites the general public to engage in the commercial transaction of giving plasma in exchange for payment.  The fact that some individuals are determined to be ineligible to donate is of no consequence, according to the plaintiffs, because the plasma collection center is inviting the general public to donate, public facilities often have certain screening rules, and the THRC applies to facilities that invite "any classification of persons from the general public."

On the other hand, CSL argues that the Legislature did not intend to apply the THRC to a plasma collection center, such as CSL's, and that a plasma collection center differs from an establishment with an open invitation for the public to visit the premises and receive a product or service in exchange for payment.  Although the ADA and THRC differ, CSL argues that the district court's and the Fifth Circuit's reasoning in determining that a plasma collection center is not a place of public accommodation should likewise lead to the conclusion that a plasma collection center is not a "public facility" under the THRC.

The Legislature's definition of "public facility" is broad.  *See* TEX. HUM. RES. CODE § 121.002(5). The THRC provides an extensive definition of "public facility" with seven enumerated

10

lists, each followed by a catch-all phrase.[4] *See id.* But that definition of "public facility" includes the word "public" seven times and defines "facility" in terms of the lists of examples of what "'public facility' includes." *See id.* We often look to dictionary definitions to shed light on the ordinary meaning of a statutory term. *See Beeman v. Livingston*, 468 S.W.3d 534, 539 (Tex. 2015). "Public" means "accessible to or shared by all members of the community," "a place accessible or visible to all members of the community." *See Public*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002). "Facility" is defined as "something that is built, constructed, installed, or established to perform some particular function or to serve or facilitate some particular end." *See Facility*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002). In defining "public facility" in the THRC, the Legislature has narrowed the plain language to broad categories. *See generally* TEX. HUM. RES. CODE § 121.002(5).

Two of the THRC's categories are potentially applicable to a plasma collection center: "a retail business, commercial establishment, or office building to which the general public is invited"; and "any other place of public accommodation, amusement, convenience, or resort to which the general public or any classification of persons from the general public is regularly, normally, or customarily invited." *Id.* We first analyze whether a plasma collection center falls under the THRC's definition of "public facility" as a "retail business, commercial establishment, or office building to which the general public is invited." *Id.* More specifically, the question is whether a plasma collection center is a "commercial establishment . . . to which the general public is invited." *Id.*

---

[4] The enumerated lists in the THRC, however, are not nearly as specific and comprehensive as the list in the ADA, which specifies types of businesses. *Compare* 42 U.S.C. § 12181(7)(A)–(L), *with* TEX. HUM. RES. CODE § 121.002(5). The THRC contains broader, more general terms for modes of transportation, businesses, and establishments. *See* TEX. HUM. RES. CODE § 121.002(5).

11

"Commercial" is not defined in the THRC, but it is generally defined as being related to or dealing with commerce. *See Commercial*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002); *Commerce*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002) ("[T]he exchange or buying and selling of commodities especially on a large scale and involving transportation from place to place."). And "establishment" is defined as "a public or private institution." *See Establishment*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002). Plasma collection centers are for-profit businesses that extract plasma, compensate donors, and package and ship plasma for it to be processed and sold. Under the plain language of the statute, a plasma collection center, of the type operated by CSL, is a commercial establishment, as plasma collection centers are profit-oriented, private institutions that deal in the commerce of extracting and selling plasma and plasma byproducts. *See Rodriguez*, 547 S.W.3d at 838 (providing that statutory terms bear their common, ordinary meaning, unless the text provides a different meaning or the common meaning leads to an absurd result).

Although we conclude that a plasma collection center is a "commercial establishment," the crux of the issue as to whether a plasma collection center is a "public facility" under the THRC is whether it is a facility to which the general public is ordinarily invited. There is no question that a plasma collection center invites the general public into its business to engage in the donation-screening process to determine donation eligibility. But CSL argues that because a plasma collection center allows only individuals who pass the screening process to donate and reserves the right to reject certain individuals, the general public is not invited to donate plasma. Therefore, we must determine whether, under the plain meaning of the THRC, a facility is public by virtue of its general

12

invitation for anyone to enter and be screened, or whether such a facility is nevertheless excluded from the definition of "public facility" because its invitation to donate plasma is restricted and limited.

The plain language of the terms "invite," "invitation," and "invited" suggests that allowing any member of the general public to enter a facility and be present for, or participate in, a screening process is "inviting" the member of the public. *See Invite*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002) (meaning "to offer an incentive or inducement"; "to provide opportunity or occasion for"; "open the way"; "increase the likelihood of"; "open the door"); *Invitation*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002) (meaning "the requesting of a person's company or participation"; "a written or verbal request to be present or participate"; "a written or verbal request to do or undertake"); *Invited*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002) (meaning "present or done by invitation"). It follows that the plain language of the THRC's definition of "public facility"—specifically, a "commercial establishment . . . to which the general public is invited"—means that a member of the general public is "invited" by a plasma collection center when it merely opens the door to them, allowing them to be present in the facility and providing them the opportunity to participate in the plasma donation process, beginning with screening. *See* TEX. HUM. RES. CODE § 121.002(5). And as such, a member of the public need not actually be able to engage in a business transaction—that is, plasma extraction and resulting compensation—to be "invited" to the commercial establishment. *See generally id.*

Here, CSL, like other plasma collection centers, extends an invitation to all members of the public to enter its collection facilities and engage in the donor screening process. In fact, a plasma

13

collection center, such as CSL's facilities, desires to admit and screen as many potential donors as possible to increase the number of donors, in turn increasing the supply of plasma that can be processed and ultimately sold for profit.[5] That a plasma collection center may not then invite all who accepted the initial invitation—made to the general public—to participate further in the plasma donation process, by allowing them to donate and receive compensation, is of no consequence. At that point, the plasma collection center, a commercial establishment, has already invited the general public into its facility for a commercial opportunity. Thus, the plasma collection center's selectivity in extending donation invitations has no bearing on whether CSL is a "public facility" under the THRC. Under the plain language of the statute, as long as the facility is a commercial establishment to which the general public is invited for some purpose, it is a "public facility" subject to the THRC.[6] *See id.*

In *Beeman v. Livingston*, in which deaf inmates at a state prison filed suit under the THRC, this Court held that the prison was not a "public facility" subject to the THRC. 468 S.W.3d at 543. The inmates claimed that the prison violated the THRC by denying deaf inmates an opportunity to participate in and benefit from certain programs available to inmates without disabilities. *Id.* at 536. They appealed to this Court, asserting that the court of appeals misconstrued the phrase "public building" within the THRC's definition of "public facility." *Id.* at 537. The inmates argued that

---

[5] In explaining that CSL would not defer a blind individual merely because of his or her disability, counsel for CSL admitted that CSL needs as many members of the public as possible to donate plasma.

[6] We note that there is no indication in our record as to the physical structure of CSL's plasma collection centers, whether Silguero and Wolfe attempted to donate at the same facility or different facilities, or the extent to which CSL's plasma collection centers may differ in structure from one to the next. We limit our answer to the question before us, which asks generally about plasma collection centers of the type described in the certified question.

14

under the plain meaning of "public building" in section 121.002(5), a building must be used for a public purpose, but need not be open and accessible to the general public. *Id.* We concluded that "construing the term 'public facility' to include prisons [did] not reflect [the] legislative intent as expressed in the term's definition and the statute as a whole." *Id.* at 539. When looking to the definition of "public facility" as a whole and the plain language, we concluded that the "Legislature used the term 'public' to indicate a status of openness and accessibility, and not a public use." *Id.* at 540. "[E]ven assuming inmates are part of the public," we noted that nothing in the statute indicates that the "Legislature intended for one small subset of the public that is involuntarily segregated from the public and has seriously constricted freedoms (*i.e.* [prison] inmates) [to] qualif[y] as the 'public'—the community as a whole." *Id.* at 542. Additionally, we noted that section 121.002(5)'s use of "public building" and "a building to which the general public is invited" could not have the same meaning. *Id.* at 540. The phrase "a building to which the general public is invited" includes "privately owned buildings that are not public buildings because they are maintained for private purposes, but to which the premises owner has extended an invitation to the general public." *Id.* at 541. This differs from a public building maintained by the government, such as a prison. *See id.* at 541–42.

*Beeman*'s plain language definition of "public"—open and accessible to the general population—applies with equal force to this certified question. As we observed in *Beeman*, prison inmates are not the general public—though they may be a small part of it—and prisons are not generally open to persons who are not inmates, with the exception of certain prison personnel and employees. *See id.* at 542. Unlike prisons, which confine inmates and separate them from the

15

general public, a plasma collection center is a commercial establishment which offers anyone the opportunity to initiate the plasma donation process, beginning with eligibility screening. As part of its public invitation, a plasma collection center offers an incentive—compensation for those eligible donors whose plasma is extracted—to help increase the number of donors and the amount of plasma byproduct that can be sold for profit. A plasma collection center is not open only to certain members of the population—it is open to everybody, though the extraction process is limited to those who are eligible based on the screening process.[7] This is consistent with *Beeman*'s analysis that "a building to which the general public is invited" includes privately owned buildings to which the "owner has extended an invitation to the general public." *Id.* at 541.

CSL argues that the THRC's definition of "public facility" should be construed in the same manner as the corresponding ADA definition of place of "public accommodation" in determining whether a plasma collection center qualifies as a "public facility." *Compare* TEX. HUM. RES. CODE § 121.002(5), *with* 42 U.S.C. § 12181(7)(A)–(L). But we held in *Beeman* that the ADA's definition did not apply to the Court's analysis of the THRC's definition of "public facility." *See* 468 S.W.3d at 542–43 (explaining that the ADA's definition of "public entity" was not informative to the Court's analysis as to the THRC's meaning of "public facility"). We explained that the THRC's definition

---

[7] To be clear, the fact that a facility meets the definition of a "public facility" under the THRC does not mean that the public must be invited to all areas of the facility, nor does it mean that the facility must allow persons with disabilities full use and enjoyment of all parts of the facility. Indeed, most public facilities will necessarily have areas the public is not permitted to use or enjoy; in those areas, excluding persons with disabilities from use and enjoyment does not constitute discrimination under the THRC because all members of the general public are equally excluded. *See* TEX. HUM. RES. CODE § 121.003(a) (reciting the general discrimination prohibition under which "[p]ersons with disabilities have the same right as persons without disabilities to the full use and enjoyment of any public facility in the state"); *see also Sapp v. MHI P'ship, Ltd.*, 199 F. Supp. 2d 578, 588–89 (N.D. Tex. 2002) (holding that a model home that was not designed to be used exclusively as a private residence, and that contained an office to which the general public was invited, made it a "public facility" under the THRC).

16

of "public facility" was enacted in 1969, while the ADA was enacted in 1990, and that any amendments to the THRC did not show a legislative intent to align the THRC's definition of "public facility" with the ADA's definition of "public entity." *See id.* (citing Act of May 20, 1969, 61st Leg., R.S., ch. 416, § 2, 1969 Tex. Gen. Laws 1374, 1375 (amended 2013) (current version at TEX. HUM. RES. CODE § 121.002(5))). Likewise, here, the ADA's definition of "public accommodation" was enacted after the THRC and is reflected in the THRC only through its definition of "public facility" as "any other place of public accommodation." *Compare* TEX. HUM. RES. CODE § 121.002(5), *with* 42 U.S.C. § 12181(7)(A)–(L). Consistent with our reasoning in *Beeman*, we conclude that the ADA's definition of "public accommodation" does not inform the THRC's definition of "public facility" as a "commercial establishment . . . to which the general public is invited." *Compare* TEX. HUM. RES. CODE § 121.002(5), *with* 42 U.S.C. § 12181(7)(A)–(L).[8] Because we hold that a plasma collection center of the type operated by CSL qualifies as a "public facility" under the THRC as a "commercial establishment . . . to which the general public is invited," we need not determine whether a plasma collection center also qualifies as a "public facility" as "any other place of public accommodation . . . to which the general public or any classification of persons from the general public is regularly, normally, or customarily invited." TEX. HUM. RES. CODE § 121.002(5).

We conclude that a business's selectivity as to whom it ultimately conducts business with does not take it out of the purview of the THRC's definition of "public facility." The Legislature

---

[8] We note that even if we were to look to the ADA's definition of "public accommodation" and the federal case law interpreting it, there is a federal circuit court split as to whether a plasma collection center falls within the ADA's definition of "public accommodation." *Compare* 907 F.3d at 329–31 (holding that a plasma collection center is not a "service establishment" and therefore does not fall under the ADA's definition of "public accommodation"), *with Levorsen*, 828 F.3d at 1234–35 (holding that a plasma collection center is a "service establishment" and falls under the ADA's definition of "public accommodation").

17

broadly defined "public facility," and we cannot unduly restrict or expand the scope of the THRC. *See Janvey*, 487 S.W.3d at 572; *see also Lippincott*, 462 S.W.3d at 508 (explaining that a court may not impose its own judicial meaning onto a statute). The question of whether a plasma collection center discriminates unlawfully by screening out certain members of the general public, denying particular individuals the opportunity to donate plasma because of their specific disabilities, is relevant not to the applicability of the THRC's "public facility" definition, but to the standards that apply under the THRC.

## IV. Texas Human Resources Code Discrimination Standards

Because we hold that a plasma collection center qualifies as a "public facility" under the THRC, we next must answer the question of what standard the THRC provides in determining whether a public facility unlawfully discriminates against a person with a disability. In other words, can a plasma collection center of the type operated by CSL ever justify excluding a potential donor based on health concerns related to the individual's disability?[9] At the outset, we note that the answer to this question applies only to facilities that do not fall under the ADA's definition of "public accommodation" but meet the THRC's definition of "public facility." Practically speaking, this situation is uncommon; the ADA applies to most public facilities, and therefore the potential implications of the answer to this question are significant only insofar as they relate to the unusual public facility that is not subject to the ADA's standards.

---

[9] We do not answer whether CSL unlawfully discriminated against Silguero and Wolfe in denying them full use and enjoyment of CSL's public facility. Nor do we address any structural, physical, or architectural standards CSL, or plasma collection centers generally, must satisfy to accommodate persons with disabilities. And we do not address any physical exclusion from CSL's facility, as the plaintiffs allege no such exclusion, but contend only that they were deprived full use and enjoyment of the facility by CSL's rejecting them from the plasma donation process. These questions are beyond the scope of the questions certified to this Court.

18

In construing a statute, our primary goal is to ascertain the Legislature's intent. *See, e.g.*, *Janvey*, 487 S.W.3d at 572 (citation omitted); *Molinet*, 356 S.W.3d at 411 (citation omitted). The THRC provides that "[p]ersons with disabilities have the same right as persons without disabilities to the full use and enjoyment of any public facility in the state." TEX. HUM. RES. CODE § 121.003(a). "No person with a disability may be denied admittance to any public facility . . . because of the person's disability," and he or she may not be denied the "use of a white cane, assistance animal, wheelchair, crutches, or other device of assistance." *Id.* § 121.003(c). Discrimination that violates the THRC includes a "refusal to allow a person with a disability to use or be admitted to any public facility, [and] a ruse or subterfuge calculated to prevent or discourage a person with a disability from using or being admitted to a public facility." *Id.* § 121.003(d). A public facility also violates the THRC if it fails to: (1) comply with the architectural barrier standards in Texas Government Code chapter 469; (2) "make reasonable accommodations in policies, practices, and procedures"; or (3) "provide auxiliary aids and services necessary to allow the full use and enjoyment of the public facility." *Id.* § 121.003(d)(1)–(3). Additionally, section 121.003(e) provides:

> Regulations relating to the use of public facilities by any designated class of persons from the general public may not prohibit the use of particular public facilities by persons with disabilities who, except for their disabilities or use of assistance animals or other devices for assistance in travel, would fall within the designated class.

*Id.* § 121.003(e).

Silguero contends that he was discriminated against on the basis of his disability when CSL did not allow him to donate plasma because he has bad knees, requiring use of a cane, and CSL believed that he might not be able to maneuver himself to and from the donation bed. He does not allege that CSL denied him use of his cane, nor does he allege that he was denied entrance into the

19

facility. Wolfe claims that CSL discriminated against her on the basis of her anxiety, deferring her solely because her use of a service dog indicated that she was severely anxious. Wolfe does not allege that CSL rejected her because it could not accommodate her use of a service dog at the facility, nor does she allege that she was denied entrance into the facility because of her use of a service dog. And CSL points to its policy to defer potential donors who suffer from anxiety requiring the use of a service dog, citing safety concerns about a donor having an anxiety attack while undergoing the extraction process.

Whether CSL violated the THRC in discriminating against the plaintiffs turns on whether CSL can deny the plaintiffs use and enjoyment of a public facility by excluding them from donating plasma on the basis of their disabilities, citing safety concerns or difficulties in carrying out the plasma extraction process. Thus, the question is whether a plasma collection center violates the THRC when it concludes that a potential donor's disability makes him or her unfit, and therefore ineligible, to donate plasma. The Fifth Circuit asks specifically about the standard for determining whether a plasma collection center's rejection of a potential donor would violate the broad prohibition against discrimination in section 121.003(a)—in other words, can a public facility lawfully deprive a person with a disability of full use and enjoyment of the facility? *See* TEX. HUM. RES. CODE § 121.003(a) ("Persons with disabilities have the same right as persons without disabilities to the full use and enjoyment of any public facility in the state.").

Here, the parties agree that certain health concerns and disabilities can justify exclusion from the use and enjoyment of a public facility. The plaintiffs advocate for a standard under which an exclusion is justified if (1) the reason given is not pretextual, and (2) serving the individual poses a

direct threat, would result in an undue burden on the facility, or the facility would be required to fundamentally alter its services to serve the person with a disability. CSL advocates for a more liberal standard—that if the public facility articulates a legitimate business purpose for exclusion from use and enjoyment based on a disability, it does not violate the THRC. Thus, the parties agree that the THRC is not a strict liability statute and that a public facility may lawfully deprive persons with disabilities from use or enjoyment of a public facility under certain circumstances; however, the parties disagree as to the circumstances.

In interpreting the applicability of the THRC's anti-discrimination standards, we must be mindful of the statute's context and its meaning as a whole. *See Fitzgerald v. Advanced Spine Fixation Sys., Inc.*, 996 S.W.2d 864, 866–67 (Tex. 1999) (indicating that judicial interpretation of a statute involves using its context and any implicit meaning contained in the language). Unlike the ADA, the THRC does not contain specific exemptions that expressly allow for lawful discrimination under certain circumstances. *Cf.* 42 U.S.C. § 12182(b)(2)(A)(i)–(iii), (b)(3) (excluding certain conduct from the definition of discrimination in the case of necessary eligibility criteria, undue burden, and fundamental alteration in goods or services provided, and excusing discrimination when there is a direct threat to the health or safety of others). However, the plain language of the THRC demonstrates that the Legislature did not intend a strict liability anti-discrimination standard. As we have explained, the Legislature set out a broad prohibition on discrimination in section 121.003: "Persons with disabilities have the same right as persons without disabilities to the full use and enjoyment of any public facility in the state." TEX. HUM. RES. CODE § 121.003(a). Re-emphasizing the right to full use and enjoyment of public facilities, section 121.003(d) provides examples of

discrimination prohibited by the THRC. *Id.* § 121.003(d). Among those examples is the "refusal to allow a person with a disability to use or be admitted to any public facility"—fully consistent with the broad discrimination prohibition in section 121.003(a). *Id.* The statute goes on to list other conduct that constitutes prohibited discrimination under the THRC. *Id.*

The plain language of the THRC indicates an intent to prohibit pretextual discrimination—since its enactment in 1969, section 102.003(d) has provided that the discrimination prohibited by the THRC includes "a ruse or subterfuge calculated to prevent or discourage a person with a disability from using or being admitted to a public facility." *Id.*; *see also* Act of May 20, 1969, 61st Leg., R.S., ch. 416, § 3, 1969 Tex. Gen. Laws 1374, 1375 (amended 1997 & 2013) (current version at TEX. HUM. RES. CODE § 121.003(d)) (originally referring to a person with a disability as a "handicapped person," however). "Ruse" is not defined in the THRC, but it means "trick" or "intended to deceive." *See Ruse*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002). And "subterfuge" means "deception by artifice or stratagem to conceal, escape, avoid, or evade," or "a deceptive device or stratagem" that "is resorted to in order to save face." *See Subterfuge*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002). Therefore, under its plain language, the THRC prohibits a public facility from using tricks or deceptive devices to avoid or evade admitting, or accommodating, a person with a disability. That is, the THRC prohibits pretextual excuses for excluding persons with disabilities from equal use and enjoyment of a public facility. *See* TEX. HUM. RES. CODE § 121.003(d); *see also Farley v. Nationwide Mut. Ins.*, 197 F.3d 1322, 1336 (11th Cir. 1999) (referring to the ADA's prohibition of "pretextual ruse[s] designed to mask retaliation" (citation omitted)); *Bohrer v. Hanes Corp.*, 715 F.2d 213, 218 (5th Cir. 1983) (reasoning that the

defendant's actions cannot be "a pretext or ruse designed to conceal a discriminatory motive" in an employment discrimination claim (citation omitted)); *Hamashiach v. Adan*, No. 14-13-00491-CV, 2015 WL 971217, at *6 (Tex. App.—Houston [14th Dist.] Mar. 3, 2015, no pet.) (mem. op.) (holding that evidence of a church's decision to issue ecclesiastical discipline against one of its disabled congregants, banning her from the church for six weeks, showed that the decision was not a ruse or subterfuge to avoid accommodating her disability under the THRC, but rather a punishment because of her threatening tone to the pastor). In doing so, the THRC accounts for the existence of certain acceptable, legitimate reasons for which a public facility may deprive persons with disabilities of full use or enjoyment of a public facility.[10]

In addition to generally prohibiting discrimination that deprives persons with disabilities of the full use and enjoyment of public facilities, section 121.003(d) further defines the types of conduct that violate the THRC, including "a failure to . . . make reasonable accommodations in policies, practices, and procedures" and a failure to "provide auxiliary aids and services necessary to allow the full use and enjoyment of the public facility," among others. TEX. HUM. RES. CODE § 121.003(d)(2), (3). By using the term "reasonable accommodations," the Legislature accepted that accommodations may be either reasonable or unreasonable, and by using the term "aids and services

---

[10] In fact, the Legislature's use of this "ruse or subterfuge" language since it enacted the predecessor to section 121.003, decades before Congress enacted the ADA, shows that the Legislature has long intended that defendants not be liable for certain discriminatory conduct, provided that their reason is not pretextual. *See* Act of May 20, 1969, 61st Leg., R.S., ch. 416, § 3, 1969 Tex. Gen. Laws 1374, 1375 (amended 1997 & 2013) (current version at TEX. HUM. RES. CODE § 121.003(d)) ("The discrimination prohibited by this section includes . . . discrimination based on a ruse or subterfuge calculated to prevent or discourage a handicapped person from using or being admitted to a public facility."). The prohibition of "ruse or subterfuge" discrimination has never changed in the statute's fifty-year history, but as we explain below, the amendment to section 121.003(d) following enactment of the ADA—including the addition of the three-part "failure to" list—further confirms the Legislature's intent that certain discriminatory conduct not violate the THRC. *See* Act of May 22, 1997, 75th Leg., R.S., ch. 649, § 4, sec. 121.003, 1997 Tex. Gen. Laws 2219, 2220 (amended 2013) (current version at TEX. HUM. RES. CODE § 121.003(d)).

necessary," the Legislature accepted that the use of auxiliary aids or services may be either necessary or unnecessary. *See id.* And by defining the prohibited discrimination with the "reasonable" and "necessary" limitations, the Legislature demonstrated its intent that failure to make unreasonable accommodations and failure to provide unnecessary aids and services would not constitute "discrimination" within the meaning of the THRC. With that in mind, section 121.003(d) can only be read to mean that excluding a person with a disability from full use and enjoyment of a plasma collection center's donation process will not automatically constitute discrimination prohibited by section 121.003. *See id.* § 121.003. While the parties do not disagree with this conclusion, they disagree about the particular circumstances in which a plasma collection center can reject a person with a disability from donating plasma, without running afoul of the discrimination prohibition in section 121.003.

Unlike the ADA, the THRC is not explicit in laying out such circumstances. But just as the THRC indicates a clear legislative intent to allow discrimination under some circumstances, it also indicates legislative intent that the circumstances under which discriminatory conduct can be lawful be similar to the ADA.[11] We have utilized comparable federal law as guidance in situations where our state statute and the federal law contain analogous statutory language. *See, e.g.*, *Chatha*, 381 S.W.3d at 505 (citing *Specialty Retailers, Inc. v. DeMoranville*, 933 S.W.2d 490, 492 (Tex. 1996) (per curiam)). And we construe statutory terms considering the context in which they are used, not

---

[11] In fact, the House Human Services Committee Report addressing the bill that was ultimately enacted to amend certain THRC provisions after Congress enacted the ADA stated that the legislation's purpose was to enact "revisionary language [that] conforms with the terminology in the [ADA]." House Comm. on Human Servs., Bill Analysis, Tex. H.B. 2525, 75th Leg., R.S. (1997). A Bill Analysis, prepared by the Senate Research Center, similarly explained that the "'clean up' revisions proposed by the committee would conform Section 121, Human Resources Code, to the terminology in the [ADA]." Senate Research Ctr., Bill Analysis, Tex. H.B. 2525, 75th Leg., R.S. (1997).

in isolation. *See Paxton*, 468 S.W.3d at 59 (citation omitted); *cf. Ojo v. Farmers Grp., Inc.*, 356 S.W.3d 421, 433 (Tex. 2011) (utilizing the context of the Legislature's awareness of the potential for disparate impact discrimination in the insurance context, and its deliberate decision not to exact an express prohibition on disparate impact discrimination in the Texas Insurance Code, to support the Court's conclusion that the Legislature did not intend to create a cause of action for disparate impact discrimination in the insurance context). This Court in *Beeman* declined to recognize a statutory exception based on a federal statute that was not analogous, implying that it is not improper to apply an analogous federal statute as an exception to our laws. 468 S.W.3d at 543 ("[T]he definition of 'public facilities' in Chapter 121 has no similar counterpart in the ADA. Therefore, we look only to the text of chapter 121 and not to cases interpreting the federal act." (citation omitted)). In the context of the ADA's standards that allow for lawful discrimination under certain circumstances—some of which were enacted before the THRC's recent amendments—and given the Legislature's choice of terminology, we interpret the THRC to allow for some lawful discrimination not inconsistent with the ADA. *See generally* 42 U.S.C. § 12182(b)(2)(A)(i)–(iii).

Cognizant of the fact that the Legislature enacted some of the discrimination standards in section 121.003 *after* Congress enacted the ADA, and that the purpose of the THRC aligns with the ADA's purpose, we find the ADA and the case law interpreting it helpful in analyzing the circumstances under which a public facility may lawfully discriminate by depriving a person with a disability of full use and enjoyment of the facility. *See Grady v. City of Fort Worth*, No. 4:00-CV-1871-A, 2002 WL 63010, at *3 n.2 (N.D. Tex. Jan. 8, 2002) ("[I]n interpreting Texas antidiscrimination laws, Texas courts consider how federal statutes covering similar subjects are

implemented." (citing *Caballero v. Cent. Power & Light Co.*, 858 S.W.2d 359, 361 (Tex. 1993));

*see also* 42 U.S.C. § 12132 (providing the purpose that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity").

We observe that the THRC's structure is similar to the ADA's as to prohibited discrimination. *Compare* 42 U.S.C. § 12182 (applying to public accommodations), *with* TEX. HUM. RES. CODE § 121.003 (applying to public facilities). Like the THRC standards, the ADA standards begin with a general rule that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment" of a place subject to the statute. *Compare* 42 U.S.C. § 12182(a), *with* TEX. HUM. RES. CODE § 121.003(a). The ADA then sets out general prohibitions and specific prohibitions. 42 U.S.C. § 12182(b)(1), (b)(2). Under the specific prohibitions, the ADA defines "discrimination" with a list of what discrimination "includes." *See id.* § 12182(b)(2)(A)(i)–(v). Within each definition of "discrimination," the ADA carves out specific exceptions to prohibited discrimination—that is, while defining unlawful discrimination, the ADA also defines what sort of discriminatory conduct is not prohibited. *See id.* Similarly, the THRC's structure begins with section 121.003(a)'s general rule and then defines "discrimination" with a list of what the discrimination prohibited by the THRC "includes." TEX. HUM. RES. CODE § 121.003(a), (d). The THRC then sets out prohibitions on discrimination. *See id.* § 121.003(d)(1)–(3). However, in setting out these prohibitions, the THRC merely implies that there are exceptions to discrimination under the THRC, rather than explicitly providing such exceptions as the ADA does. As explained above, the statutory language indicates

26

that the Legislature intended for there to be exceptions to the THRC's definition of "discrimination."

Based on the ADA's congruent structure and analogous purpose, we find the ADA helpful in determining the specific exceptions to the THRC's prohibited discrimination, as the Legislature intended.

> The ADA provides that discrimination includes:
>
> (i) the imposition or application of eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any goods, services, facilities, privileges, advantages, or accommodations, *unless such criteria can be shown to be necessary for the provision of the goods, services, facilities, privileges, advantages, or accommodations being offered*;
>
> (ii) a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, *unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations*;
>
> (iii) a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, *unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden* . . . .

42 U.S.C. § 12182(b)(2)(A)(i)–(iii) (emphasis added). Likewise, the THRC provides that persons with disabilities may not be deprived of the full use and enjoyment of a public facility, and the statute sets out similar specific prohibitions, while using language that contemplates the existence of exceptions. *See* TEX. HUM. RES. CODE § 121.003.

Section 12182(b)(2)(A)(i) of the ADA, in particular, is relevant in illustrating how we may draw on the ADA in interpreting the THRC. That ADA provision prohibits certain conduct that

27

constitutes discrimination within the meaning of the ADA—the imposition or use of eligibility criteria that screens out persons with disabilities and deprives them of full use and enjoyment—but it explains that "discrimination includes [such conduct] unless" the use of such criteria is necessary to providing the services being offered. *See* 42 U.S.C § 12182(b)(2)(A)(i). Thus, under this provision, a defendant's conduct may be lawful if it either does not meet the definition of "discrimination" or if it satisfies the exception. *See Emery v. Caravan of Dreams, Inc.*, 879 F. Supp. 640, 644 (N.D. Tex. 1995) (holding that the defendant's policy of allowing smoking in all areas of its theater did not meet the definition of "discrimination" in the ADA's eligibility/screening provision, and that it met the exception in the ADA's modification provision). Although the Texas Legislature declined to provide explicit exceptions to the prohibited discrimination in section 121.003 of the THRC, we note that the Legislature amended the THRC after the ADA was enacted, adopting similar terminology, and the Legislature has amended the THRC numerous times since, each time leaving in place the relevant parallels to the ADA. *See Acker v. Tex. Water Comm'n*, 790 S.W.2d 299, 301 (Tex. 1990) (reciting the presumption that the Legislature knows the existing law when it enacts a statute). We believe the Legislature intended section 121.003 and its "includes" definition of "discrimination" to reflect the discriminatory conduct exceptions in the ADA, including an exception that would allow a defendant to exclude a person with a disability from full use and enjoyment of a public facility when utilization of eligibility criteria that screens out certain persons with disabilities is necessary to the defendant's provision of services. *See generally* TEX. HUM. RES. CODE § 121.003(d)(1)–(3).

28

The plaintiffs look to the THRC's reference to "reasonable accommodations" in THRC section 121.003(d)(2) as the basis for their proposed lawful discrimination standard, arguing that although the term is not defined in the THRC, it must be interpreted to have a meaning similar to that in the ADA's modification provision, particularly because the Legislature added this language after the enactment of the ADA. *See generally* 42 U.S.C. § 12182(b)(2)(A)(i)–(iii). By extension, the plaintiffs assert that this understanding of "reasonable accommodation" should inform the standard the Court provides in answering the second certified question, which asks not about claims under the reasonable accommodation provision, but under the general prohibition against deprivation of full use and enjoyment. Without attempting to delineate or define the parameters around what constitutes a "reasonable" modification under the ADA, we recognize that a defendant will not be liable under the ADA for refusal to make an unreasonable modification in policies, practices, or procedures. *See* 42 U.S.C. § 12182(b)(2)(A)(ii); *e.g.*, *McCoy v. Tex. Dep't of Criminal Justice*, No. C-05-370, 2006 WL 2331055, at *9–10 (S.D. Tex. Aug. 9, 2006) (holding that a prison did not unlawfully discriminate against an asthmatic prisoner by refusing to provide alternative housing, when there was no conclusive showing of a reasonable housing alternative or that some other accommodation would have been reasonable). Nor will a defendant be liable under the ADA for refusal to make a modification that may be reasonable but would fundamentally alter the nature of the service it provides. *See* 42 U.S.C. § 12182(b)(2)(A)(ii) (providing an exception when "the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations"). We likewise read the THRC's use of "reasonable accommodations" to mean that a public facility may lawfully refuse unreasonable

accommodations or accommodations that would fundamentally alter the nature of its goods, services, or facilities. *See* TEX. HUM. RES. CODE § 121.003(d)(2).

Similarly, a defendant will not be liable under the ADA for refusal to provide auxiliary aids and services that are not necessary to ensure that persons with disabilities are not treated differently from others. *See* 42 U.S.C. § 12182(b)(2)(A)(iii). Nor will a defendant be liable under the ADA for refusal to provide necessary auxiliary aids or services when doing so would fundamentally alter the nature of services it provides or would create an undue burden. *See id.* (providing an exception when "the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden"); *Greer v. Richardson Indep. Sch. Dist.*, 472 F. App'x 287, 291–92 (5th Cir. 2012). We likewise read the THRC's auxiliary aids and services provision to mean that a public facility defendant may lawfully refuse unnecessary auxiliary aids and services or auxiliary aids or services that would fundamentally alter the nature of its goods, services, or facilities, or would create an undue burden. *See* TEX. HUM. RES. CODE § 121.003(d)(3).

Moreover, the ADA specifically provides that nothing in the ADA "shall require an entity to permit an individual to participate in or benefit from the goods, services, facilities, privileges, advantages and accommodations of such entity where such individual poses a direct threat to the health or safety of others." 42 U.S.C. § 12182(b)(3). The direct-threat exception is utilized as a general affirmative defense to any claim for discrimination. *See, e.g.*, *Bench v. Six Flags Over Tex., Inc.*, 3:13-CV-705-P, 2014 WL 12586743, at *4–5, *8–9 (N.D. Tex. July 7, 2014) (citations omitted). A "direct threat" is "a *significant* risk to the health or safety of others that cannot be eliminated by

30

a modification of policies, practices, or procedures or by the provision of auxiliary aids or services."

42 U.S.C. § 12182(b)(3) (emphasis added); *see Doe v. County of Centre*, 242 F.3d 437, 447 (3d Cir. 2001) (citing 42 U.S.C. § 12182(b)(3); *Sch. Bd. of Nassau Cty. v. Arline*, 480 U.S. 273, 287 n.16 (1987)). And "[t]he existence, or nonexistence, of a significant risk must be determined from the standpoint of the person who refuses the [modification] or accommodation, and the risk assessment must be based on medical or other objective evidence." *Bragdon v. Abbott*, 524 U.S. 624, 649 (1998) (citation omitted). Just as establishment of the direct-threat affirmative defense excuses a defendant from liability for discrimination under the ADA, we hold that a defendant will not be liable for discrimination under the THRC when allowing a person with a disability to participate in or use the defendant's services or facilities would pose a direct threat to the health or safety of others. *See Bench*, 2014 WL 12586743, at *5 n.12 (accepting the defendant's argument that ADA claims and THRC claims "rise and fall together," and concluding that an affirmative defense under the ADA also makes discrimination lawful under state law). In sum, we hold that a defense or exception that would excuse a defendant from discrimination liability under the ADA—whether it be because of a direct threat, undue burden, fundamental alteration, or necessity of eligibility criteria—would also exclude a public facility defendant from liability under the THRC.

The question certified to this Court asks specifically about deprivation of full use and enjoyment of a public facility under section 121.003(a). Section 121.003(d) references section 121.003(a) in referring to "discrimination prohibited by this section." *See* TEX. HUM. RES. CODE § 121.003(a), (d). So a claim under section 121.003(a) that a person with a disability has been unlawfully deprived of full use and enjoyment of a public facility also constitutes a claim under

31

section 121.003(d) that the individual was refused use of a public facility—as both section 121.003(a) and (d) prohibit depriving a person with a disability from use of a public facility. Therefore, to the extent that section 121.003(d) contemplates lawful discrimination and excuses the exclusion of persons with disabilities from use of public facilities, these exceptions allowing for lawful discrimination extend to claims under section 121.003(a). And to the extent that the plaintiffs here allege claims under section 121.003(a) relating to CSL's rejection of them as plasma donors, their complaints should be construed to also allege claims under the parallel part of section 121.003(d).[12]

Generally, a plaintiff alleging a THRC discrimination claim has the burden to establish that the defendant discriminated against the plaintiff due to the plaintiff's disability, and the plaintiff must satisfy that burden by a preponderance of the evidence. *See Tex. State Hotel, Inc. v. Heagy*, 650 S.W.2d 503, 504–05 (Tex. App.—Houston [14th Dist.] 1983, no pet.) (holding that a blind plaintiff claiming a violation of the THRC failed to prove by a preponderance of the evidence that the defendant discriminated against him because he was blind). Analogous employment discrimination cases are relevant here in articulating the burden under the THRC. *See, e.g., Davis v. City of Grapevine*, 188 S.W.3d 748, 758–59 (Tex. App.—Fort Worth 2006, pet. denied), *abrogated on other grounds by Lujan v. Navistar, Inc.*, 555 S.W.3d 79, 87 (Tex. 2018)); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) (setting out the applicable burdens in the employment

---

[12] We express no opinion as to whether Silguero's and Wolfe's complaints also allege claims as to pretextual reasons for rejecting them and thus depriving them of the opportunity to donate plasma and receive compensation, or claims as to the failure to make reasonable accommodations as to a policy, practice, or procedure. The record before us does not contain their complaints, and we are therefore limited by the information the Fifth Circuit has provided to us. We trust that the Fifth Circuit will analyze each plaintiff's complaint to determine exactly what discrimination allegations each makes under section 121.003(d). *See Emery*, 879 F. Supp. at 644 (analyzing the case as if the plaintiff had brought a reasonable accommodations claim, based on the nature of the plaintiff's argument).

discrimination context). In the context of ADA claims for discrimination as to public accommodations, a defendant is not liable when the defendant's conduct does not meet the applicable ADA definition of "discrimination," when an exception is satisfied, or when the defendant proves the direct-threat affirmative defense. *See Bench*, 2014 WL 12586743, at *8. We see no reason, and no authority, for a different framework for claims under the THRC.

We hold that a defendant's exclusion of a person with a disability from full use and enjoyment of a public facility, including services provided at the public facility, does not run afoul of the THRC's broad discrimination prohibition in section 121.003(a) when: (1) the defendant's conduct does not meet the definition of "discrimination" contemplated by the THRC or satisfies an exception, such as the exclusion that allows a defendant to use eligibility or screening criteria that exclude persons with disabilities from full use and enjoyment when such criteria are shown to be necessary for the provision of services; or (2) the defendant establishes that allowing the person full use and enjoyment of the public facility would pose a direct threat to the health or safety of others. *See* 42 U.S.C. § 12182(b)(2)(A)(i) (providing the equivalent standard for ADA claims relating to deprivation of full use and enjoyment of a facility via eligibility criteria that screen out persons with disabilities); *id.* § 121282(b)(2)(A)(i)–(iii) (setting out definitions of discriminatory conduct and exceptions); *id.* § 121282(b)(3) (setting out the direct-threat affirmative defense).

## V. Conclusion

The Legislature broadly defined "public facility." A commercial establishment that invites the general public into its doors for the opportunity to do business falls within the THRC's definition of "public facility." Therefore, we answer the first certified question in the affirmative—that a

33

plasma collection center, such as those operated by CSL, is a "public facility" under the THRC. The ADA's analogous provisions are informative as to the standards by which a facility may lawfully discriminate on the basis of a disability. Based on the plain language of the THRC and the relevant provisions of the ADA, we conclude that the Legislature intended the THRC to encompass exceptions to the requirement that persons with disabilities be afforded full use and enjoyment of a public facility to the same extent as the general public. We answer the second certified question that a defendant's exclusion of a person with a disability from full use and enjoyment of a public facility does not run afoul of the THRC's broad discrimination prohibition when: (1) the defendant's conduct does not meet the THRC's definition of "discrimination" or satisfies an exception to the definition of "discrimination," such as the exception for use of eligibility criteria that screen out certain persons with disabilities, but are necessary for the public facility's provision of services; or (2) the defendant establishes that allowing the person with a disability full use and enjoyment of the public facility would pose a direct threat to the health or safety of others. *See* 42 U.S.C. § 12182(b)(2)(A)(i)–(iii), (b)(3).

_____
Paul W. Green
Justice

OPINION DELIVERED: June 28, 2019

34