# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-41206

United States Court of Appeals
Fifth Circuit

**FILED**

October 23, 2018

Lyle W. Cayce
Clerk

MARK SILGUERO,

> Plaintiff - Appellant

AMY WOLFE,

> Intervenor - Appellant

v.

CSL PLASMA, INCORPORATED,

> Defendant - Appellee

———————————————

Appeal from the United States District Court
for the Southern District of Texas

———————————————

Before KING, ELROD, and HAYNES, Circuit Judges.

HAYNES, Circuit Judge:

CSL Plasma, Inc. is a plasma collection center that will pay anyone who passes its screening test to donate plasma. Mark Silguero and Amy Wolfe are both individuals with disabilities who attempted to donate plasma but whom CSL Plasma deferred for reasons they allege related to their disabilities. Silguero used a cane and had a limp; Wolfe had anxiety and required the use of a service animal. Silguero and Wolfe sued under the Americans with Disabilities Act ("ADA") and Chapter 121 of the Texas Human Resources Code

## No. 17-41206

("THRC"). The district court granted summary judgment in CSL Plasma's favor. It concluded that those laws did not apply because CSL Plasma was neither a "public accommodation" under the ADA nor a "public facility" under the THRC.

We affirm the district court's decision regarding the scope of the ADA. The core dispute is whether CSL Plasma is a "service establishment" within the definition of "public accommodation." We conclude it is not. CSL Plasma does not provide any "service" to customers. Instead, it pays them for the inconvenience of donating plasma so that it can collect a commercially valuable asset. We certify the THRC questions to the Supreme Court of Texas.

### I.     Background

CSL Plasma operates a network of plasma collection centers. It offers to pay members of the public to donate[1] plasma. Individuals who wish to donate must pass a screening evaluation that confirms that the individual donating and the plasma extracted meet Food and Drug Administration (FDA) regulations. Those who do not pass the screening, for whatever reason, are deferred—told they will not be permitted to donate and will not be paid.

Those who pass the screening are taken to a room where they are connected to specialized machinery that removes their blood, separates the plasma, and then re-circulates the remaining elements of blood into their system. After CSL Plasma extracts the plasma, it pays the individual. There is no indication in the record that members of the public pay CSL Plasma in exchange for plasma collection or that it offers any services for which the public

---

[1] The district court refused to use the word "donate" because "individuals are compensated for supplying their plasma" and it was therefore "inaccurate to refer to them as 'donors' or to the process as 'donation.'" We use the term donate and its variants because that term is used in federal regulations covering the process. *See, e.g.*, 21 C.F.R. § 606.100. But, for clarity, CSL Plasma pays any individual who donates plasma.

2

can pay. CSL Plasma sells the plasma it collects to other private entities who use it for various medical purposes.[2] Nothing in the record indicates that CSL Plasma enters into any sort of contingency fee arrangement with members of the public, where the individual donating receives a percentage of the eventual sale price.

Silguero and Wolfe are two individuals who attempted to donate plasma at CSL Plasma but were both deferred. Silguero had previously donated before his deferral, while Wolfe had never donated before. The parties dispute the precise motivation for why Silguero and Wolfe were each deferred. But all agree that the deferrals were based on pre-existing policies implicating Silguero's and Wolfe's disabilities.[3]

Silguero was initially deferred in December 2013, and he says that the deferral was based on CSL Plasma's policy not to accept donors who have an "unsteady gait," though the precise reason for his initial deferral has changed over time. Silguero has bad knees and requires the use of a cane to walk. After the initial deferral, CSL Plasma permanently deferred him because he allegedly later threatened employees for initially deferring him. Silguero has presented evidence that he never threatened employees or reacted inappropriately to the initial deferral; he asserts that CSL Plasma's reason for

---

[2] The parties do not dispute the district court's characterization that CSL Plasma sells the plasma. Some of the record evidence indicates that CSL Plasma may keep the plasma within its corporate family rather than selling it to completely unrelated parties. We do not believe the difference is material to the outcome of the case.

[3] CSL Plasma argues that it implemented the policies in an effort to comply with the FDA's general regulation that collection centers only allow those in "good health" to donate. 21 C.F.R. § 630.10(a). The parties disagree about the extent to which the particular policies at issue are necessary to comply with the FDA regulations. Obviously, any specific FDA regulations necessary to protect the health of the plasma donors or recipients would override any contrary statutes of general application, such as the ADA. Given our holding in this case, we need not explore this potential dichotomy further.

No. 17-41206

his permanent deferral is essentially a pretext to cover for discrimination based on his disability. He remains permanently deferred.[4]

Wolfe was deferred in October 2016 based on CSL Plasma's policy not to accept donors whose anxiety was severe enough to require the use of a service animal.[5] The parties agree that CSL Plasma had a preexisting policy that applied to all individuals who used animals to treat anxiety. At the time Wolfe tried to donate, a doctor at CSL Plasma was contacted to verify that she would be unable to donate due to her service animal.[6] The record is unclear to what extent the doctor reviewed information unique to Wolfe. But regardless of her unique circumstances, she will be unable to donate so long as she uses her service animal to treat the anxiety.

Silguero and Wolfe both sued, alleging unlawful discrimination under Title III of the ADA, 42 U.S.C. § 12182, and Chapter 121 of the THRC, TEX. HUM. RES. CODE § 121.001 *et seq.* CSL Plasma moved for summary judgment, arguing that it was neither a "public accommodation" under the ADA nor a "public facility" under the THRC. It also argued that Silguero and Wolfe could not identify a genuine issue of material fact or show that CSL Plasma had done anything other than impose a legitimate safety requirement. The district court granted summary judgment, concluding that neither the ADA nor the THRC

---

[4] Were we to conclude that the ADA applies here, there would be a fact question as to the reason for his permanent deferral.

[5] The record is unclear whether the animal was a "service animal" as that term is used in various statutes and regulations. However, because we view the facts in the light most favorable to the non-moving party and the issue was not specifically briefed by CSL Plasma before the district court, we assume it was a "service animal."

[6] We offer no opinion here on whether use of a service animal renders a person "disabled" for purposes of the ADA sections in question. *See* 42 U.S.C. 12102(1) & (3) (defining "disability" and "regarded as" having a disability). We assume arguendo that it does.

4

No. 17-41206

applied to CSL Plasma.  It did not address CSL Plasma's other arguments. Silguero and Wolfe now appeal.

## II.    Standard of Review

This court reviews de novo a district court's grant of summary judgment, applying the same standard as the district court.  *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 328 (5th Cir. 2017) (citing *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 498 (5th Cir. 2001)).  It reviews all evidence in the light most favorable to Silguero and Wolfe, the non-moving parties.  *See id.* at 328–29.

## III.    Discussion

We first address why we agree with the district court that CSL Plasma is not a "public accommodation" under the ADA.  We then explain why we certify questions about the THRC to the Supreme Court of Texas and set out the necessary information for the Supreme Court of Texas to answer the questions.

### A. ADA Claim

The crux of this case is whether CSL Plasma is a "service establishment" under 42 U.S.C. § 12181(7)(F).  If it is, then it is a "place of public accommodation," and Title III of the ADA applies to it.  *See* 42 U.S.C. § 12182(a).  If it is not, then it cannot be held liable for discrimination under Title III.[7]

The term "service establishment" appears in the definition of public accommodation.  The definition includes twelve different categories of accommodations.  The single category at issue in this case includes an enumerated list of fifteen establishments, followed by the catchall phrase "or

---

[7] Of course, this opinion in no way countenances any such discrimination not grounded in safety and health regulations, but our inquiry is limited to the scope of the ADA's coverage here—nothing more, nothing less.

other service establishment." 42 U.S.C. § 12181(7)(F).[8] Silguero and Wolfe do not argue that plasma collection centers are among the enumerated items listed in that category.

Instead, the dispute is over the catchall phrase "other service establishment."[9] The parties agree that a "service establishment" is, unsurprisingly, an "establishment" providing "services" to others. They also agree that CSL Plasma is an "establishment." They disagree about whether CSL Plasma provides "services" to others.[10]

The word "service" generally denotes some "helpful act" or an "act giving assistance or advantage to another." *See Service*, MERRIAM-WEBSTER COLLEGIATE DICTIONARY (10th ed. 1993); *Service*, WEBSTER NEW WORLD COLLEGIATE DICTIONARY (3d ed. 1996). The adjective "helpful" in the first definition implies that someone receives help from the act. In the second definition, the verb "giving" and the preposition "to" indicate that the "assistance or advantage" is conveyed from the act to the individual.

---

[8] The list is as follows: "a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office of a health care provider, hospital, or other service establishment." 42 U.S.C. § 12181(7)(F).

[9] The Department of Justice filed an amicus brief expressing its view that plasma collection centers are "service establishments" under Title III. Neither the DOJ nor the parties contend that the DOJ's views are entitled to *Chevron* deference. Rightly so, because agencies are not entitled to deference when they assert their statutory interpretations solely through litigation briefs. *See Christensen v. Harris Cty.*, 529 U.S. 576, 587, (2000); *Freeman v. Quicken Loans, Inc.*, 626 F.3d 799, 805–06 (5th Cir. 2010), *aff'd on other grounds*, 566 U.S. 624 (2012); *see also Ball v. Memphis Bar-B-Q Co.*, 228 F.3d 360, 365 (4th Cir. 2000). At most, the DOJ's views would be entitled to "respect" under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), which is given "only to the extent that [the government's] interpretations have the power to persuade." *ExxonMobil Pipeline Co. v. United States Dep't of Transp.*, 867 F.3d 564, 574 n.4 (5th Cir. 2017) (quoting *Moore v. Hannon Food Serv., Inc.*, 317 F.3d 489, 497 (5th Cir. 2003)). Because we are unpersuaded by the DOJ's interpretation, we do not defer to it.

[10] Silguero and Wolfe argue that CSL Plasma advertises plasma collection as a "service" it gives for customers. How a party advertises the work it performs has no bearing on what Congress meant by the term "service."

No. 17-41206

Congress's use of the word "service" thus suggests not only that the establishment performed some action but also that the action helped or benefited the recipient. In the case of a "service establishment," the establishment serves the members of the public who are "helped" or "benefited" by the service. Other definitions from authoritative dictionaries bolster this reading. For example, service can also be defined as "the provision (of labour, material appliances, etc.) for the carrying out of some work for which there is constant public demand." *Service*, OXFORD-ENGLISH DICTIONARY (2d ed. 1988); *see also Service*, RANDOM HOUSE DICTIONARY (2d ed. 1987) ("[T]he organized system of apparatus, appliances, employees, etc., for supplying some accommodation required by the public."). The "provision" of the "work" goes to the "public" who "demands" it.[11]

Based on these dictionary definitions, a "service establishment" is an establishment that performs some act or work for an individual who benefits from the act or work.[12] Our definition is materially similar to the one developed by the Tenth Circuit, the only other federal court of appeals to address the ADA's applicability to plasma collection centers. *See Levorsen v. Octapharma Plasma, Inc.*, 828 F.3d 1227 (10th Cir. 2016). It defined a "service

---

[11] Silguero and Wolfe also rely on Black's Law Dictionary to define "service," but it cuts against their argument. Black's defines "service" to mean work that is usually done in exchange "for a fee," which Silguero and Wolfe concede did not happen here. *Service*, BLACK'S LAW DICTIONARY (10th ed. 2010).

[12] Silguero and Wolfe emphasize the definition for the word "service" that we have used in other contexts. *See Frame v. City of Arlington*, 657 F.3d 215, 226 (5th Cir. 2011) (en banc) (noting that "service" under Title II of the ADA generally means "the performance of work commanded or paid for by another," or "an act done for the benefit or at the command of another"); *Hodges v. Delta Airlines, Inc.*, 44 F.3d 334, 336 (5th Cir. 1995) (en banc) (noting that "service" under a provision of the Airline Deregulation Act generally means "a bargained-for or anticipated provision of labor from one party to another"). We do not rely on the definitions of "service" in other contexts because differing contexts can create different meanings. But we note that even if we were to rely on those definitions, they would reinforce the definition we have identified here.

establishment" to mean "a place of business or a public or private institution that, by its conduct or performance, assists or benefits someone or something or provides useful labor without producing a tangible good for a customer or client." *Id.* at 1231. Though its definition has additional verbs, each of the verbs connote aid or benefit performed by the establishment for the customer.[13]

We disagree with the Tenth Circuit, however, about whether plasma collection centers provide a "service" to customers. Three textual clues lead us to that result. First, the word "service" implies that the customer is benefitted by the act, and no such benefit occurs here. Second, the list preceding the catchall term "other service establishment" does not include any establishments that provide a "service" without a detectable benefit to the customer. Finally, third, the structure of the ADA indicates that an establishment typically does not pay a customer for a "service" it provides.

First, the words "service establishment" alone imply that the plasma donation at issue here is not a "service." As our review of the dictionary definitions above demonstrates, the "service" in "service establishment" is generally viewed as flowing from the establishment to an individual. Here, donors receive no obvious "benefit" or "help" which would make the plasma collection center's act a "service." They are hooked up to a machine and drained of life-sustaining fluid, subjecting them to discomfort and medical risks. Donors do not have the plasma earmarked for themselves or to aid a specific third party for whom they are concerned. Instead, the plasma becomes the property of the plasma collection center to do with it whatever it pleases. The labor is not "useful" to the donor; it is "useful" to the establishment. The donor

---

[13] We need not decide whether a "service" cannot produce a tangible good. If anything, it supports our conclusion that plasma collection is not a "service" because the goal of the process is to create marketable plasma. But the parties have not focused their briefing on this point, and we therefore need not address it.

is benefitted only by the payment of money, which is wholly collateral to the act of plasma collection.  Thus, as plasma collection occurs in this case, the individual performs a service for the establishment, not the other way around.

Second, this reading of "service establishment" is bolstered by the enumerated list preceding that catchall phrase.  Generally, a catchall phrase should be read in light of the preceding list, an interpretive maxim known as ejusdem generis ("of the same kind").  *See Norfolk & W. Ry. Co. v. Am. Train Dispatchers' Ass'n*, 499 U.S. 117, 129 (1991).  Silguero and Wolfe argue we should not apply ejusdem generis here for two reasons.  One, the term "public accommodation" is to be liberally construed.  *See PGA Tour, Inc. v. Martin*, 532 U.S. 661, 676–77 (2001).  But even when a statute is to be construed liberally, it is still not untethered from its text.  *See Watson v. Philip Morris Cos.,* 551 U.S. 142, 147 (2007).  Canons of interpretation help ensure that words are not stretched past the limits Congress intended.  *See Chickasaw Nation v. United States*, 534 U.S. 84, 94 (2001).  If Congress wanted to cover all "establishments" it could have done so, omitting the word "service."  So a "liberal" reading cannot be one which reads out one of the words.  Thus, applying ejusdem generis helps us ensure we honor Congress's legislative choices.

The second reason they offer for ignoring ejusdem generis is the legislative history.  Legislative history is a last resort for ambiguous statutes, and it does not help the plaintiffs here in any event. [14]  *See Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 634 (2018).

---

[14] The legislative history argued by Silguero and Wolfe does not support their conclusion.  They point out only that a previous version of the bill wrote the catchall as "other *similar* places."  *See* H.R. Conf. Rep. No. 101-596, at 75 (1990).  The House Report indicates the word "similar" was removed because plaintiffs would "not have to prove that the entity being charged with discrimination is similar to the examples listed."  H.R. Rep. No. 101-485, pt. 3, at 54 (1990).  Putting a finer point on it, the Report explained that "the person must show that the entity falls within the overall category.  For example, it is not necessary to show that a jewelry store is like a clothing store.  It is sufficient that the jewelry store sells

No. 17-41206

Applying ejusdem generis highlights how oddly plasma collection centers would fit into the list. Each of the items on the list in 42 U.S.C. § 12181(7)(F) involves establishments acting in some way that clearly benefits the individual. Dry-cleaners press customers' shirts. Lawyers file clients' pleadings. Hospitals mend patients' broken bones. For each, the establishment performs an action that directly benefits the individual, just as we defined the term above. But plasma collection does not provide any detectable benefit for donors.

Silguero and Wolfe contend that the list, however, supports a broader reading of "service establishment" for two reasons. One, they argue that some of the establishments on the list may perform services for free. For instance, legal aid clinics provide services to the indigent free of charge. But the absence of payment does not change the fact that lawyers' work unambiguously is done to benefit clients so that the work would be a "service." Two, Silguero and Wolfe contend that one of the examples, a bank, may not only perform some services for free but may pay customers through interest on savings. But in that instance, any "free" services and payment are directly linked to the act the bank performs to benefit the customer. Banks manage money. They benefit customers by storing and leveraging it. Any payment customers receive is not a result of the customer's labor but is instead an intrinsic result of the act the bank performs to serve the customer. Contrast that with plasma collection centers. After the donor expends his time and resources donating plasma, the plasma belongs to the plasma collection center. The plasma collection center does not manage or oversee the plasma on behalf of the donor.

---

items to the public." *Id.* This example shows that Congress was concerned about unduly limiting the catchalls to be limited to variants of the enumerated items. Here, we do not use ejusdem generis to limit "service establishments" to certain types of services; we use it to determine what a "service" is.

Donors are therefore unlike bank customers because they are not benefitted by the act the establishment performs.

The third reason we conclude that CSL Plasma does not provide a "service" is that CSL Plasma pays for plasma donation, which the structure of the ADA indicates is governed by other provisions. The parties agree that CSL Plasma pays all donors for plasma donation. That relationship is more akin to employment or contract work, not the provision of a "service" to a customer. Indeed, our lexicon confirms that society thinks of those relationships as different. "Customers" are "*purchaser*[*s*] of goods and services." *See Customer*, OXFORD ENGLISH DICTIONARY (2d ed. 1989) (emphasis added). In contrast, an "employee" is a "person who works for an employer . . . for wages or a salary." *See Employee*, OXFORD ENGLISH DICTIONARY (2d. 1989). Payment is thus relevant because it may indicate whether an individual is a customer or is instead an employee or other hired laborer.

The distinction between customer relationships and employment relationships is embodied in the structure of the ADA. Title I applies to employment relationships, while "service establishment" defines "public accommodations" under Title III. *Compare* 42 U.S.C. § 12112(a) *with* 42 U.S.C. § 12181(a). Congress made specific legislative choices about how broadly Title I would apply. For instance, Title I protects only "employees" and extends only to employers hiring a sufficient number of employees. *See* 42 U.S.C. § 12111(4)–(5). Thus, courts have often determined that employees at small businesses and independent contractors are not protected by Title I of the ADA. *See Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 441 (2003) (noting that the ADA "is inapplicable to very small businesses"); *Flynn v. Distinctive Home Care, Inc.*, 812 F.3d 422, 427 & n.20 (5th Cir. 2016) (collecting persuasive authority that independent contractors are not covered by Title I of the ADA). If we interpret "service establishment" in Title III so broadly that

it includes employment and employment-like relationships, we risk overrunning Congress's legislative choices in Title I.

The way that Silguero and Wolfe interpret "service," Title III makes Title I largely redundant. They contend plasma collection benefits donors (and is therefore a "service") because it enables them to "realize" the "commercial value" of their plasma, which they could not otherwise do without CSL Plasma.[15] That conception of a "service" would turn virtually every employer and entrepreneur into a "service establishment." After all, a small restaurant enables cooks to "realize" the "commercial value" of their skills by providing a location for hungry people to come. A construction general contractor enables construction independent contractors to "realize" the "commercial value" of their machinery by connecting them with clients in need. A commercial landscaper buying gravel from a rock quarry enables the quarry to "realize" the "commercial value" of its gravel by putting it to commercial use. Under Silguero and Wolfe's interpretation, employees or contractors of these establishments could simply dodge the narrowing scope of Title I and sue under Title III. It is illogical to construe one title to eviscerate the other.

We thus reject Silguero and Wolfe's argument that the direction of payment for services is irrelevant. In doing so, we reject the Tenth Circuit's conclusion that a service is provided "regardless of whether [establishments] provide or accept compensation as part of that process." *Octapharma Plasma,*

---

[15] In passing, Silguero and Wolfe also contend that CSL Plasma "offers discrete medical services even apart from evaluation and medical extraction," including "advice about how to improve hematocrit and protein levels" and "donors' blood pressure." These supposed services do not change the outcome in this case. First, Silguero and Wolfe have not contended that they sought but were denied these supposed services. Indeed, nothing in their complaints suggests that they want to avail themselves of these supposed services rather than donate. Second, these were not services but were instead incidental to the donation process. They are no more "services" than is a background check for a job application.

*Inc.*, 828 F.3d at 1233–34.  We do not hold that payment from a customer to the establishment is necessary to be considered a "service establishment" or that a "service" is never performed when an establishment compensates an individual.  We conclude merely that payment—to or by the establishment—is highly relevant in determining whether an establishment provides a "service" to a customer and is therefore a "service establishment."[16]

Here, CSL Plasma pays donors who receive no detectable benefit from the act of donation.  Its entire business model is structured this way.  It thus does not offer plasma collection as a "service" to the public and is therefore not a "service establishment."  We affirm the district court's order granting summary judgment to CSL Plasma on Silguero's and Wolfe's ADA claims.

**B. THRC Claim**

Silguero and Wolfe have also sued under § 121.003(a) of the THRC, which provides similar protection for disabled individuals under state law.  The district court concluded that CSL Plasma was not a "public facility" under the THRC and therefore was not subject to liability.  We examine whether Texas has already addressed this question and, if not, whether we can and should certify the question to the state's highest civil court.

The THRC differs significantly from the ADA.  It was enacted before the ADA.  It is not split into various titles that cover distinctly different activities.  It uses different terms to define its scope.  Instead of applying to "public accommodations," it applies to "public facilit[ies]."  *See* TEX. HUM. RES. CODE. § 121.003(a).  The term "public facility" is defined in an entirely different manner than "public accommodation" under the ADA.  *See* TEX. HUM. RES. CODE § 121.002(5).  Recognizing these differences, the Supreme Court of Texas

---

[16] This conclusion is consistent with *PGA Tour, Inc.*, where the Supreme Court determined that a golfer entering a tournament open to the public was protected by Title III partly because the golfer paid $3,000 to enter the tournament.  *See* 532 U.S. at 679.

has said it will not look to federal courts' interpretations of "public accommodation" to interpret the term "public facility." *See Beeman v. Livingston*, 468 S.W.3d 534, 542–43 (Tex. 2015). We cannot simply assume that, because CSL Plasma is not a "public accommodation" under the ADA, it is not a "public facility" under the THRC.

But answering the question of whether a plasma collection center is a "public facility" is difficult. Texas courts have not interpreted the term "public facility" often. The Supreme Court of Texas only appears to have done so once and in a far different context from this case. *See id.* No Texas appellate court, to our knowledge, has addressed the application of the THRC to plasma collection centers. Thus, we examine whether we can and should certify the question to the Supreme Court of Texas.

The Texas Constitution grants the Supreme Court of Texas the power to answer questions of state law certified by a federal appellate court. TEX. CONST. art. V, § 3-c(a). Texas rules provide that we may certify "determinative questions of Texas law having no controlling Supreme Court [of Texas] Precedent" to the Supreme Court of Texas. TEX. R. APP. P. 58.1. Our case law provides factors to use in deciding whether to certify a question:

> (1) the closeness of the question and the existence of sufficient sources of state law; (2) the degree to which considerations of comity are relevant in light of the particular issue and case to be decided; and (3) practical limitations of the certification process: significant delay and possible inability to frame the issue so as to produce a helpful response on the part of the state court.

*Swindol v. Aurora Flight Scis. Corp.*, 805 F.3d 516, 522 (5th Cir. 2015) (internal quotation marks omitted) (quoting *Williamson v. Elf Aquitaine, Inc.*, 138 F.3d 546, 549 (5th Cir. 1998)).

Turning to the first factor, we have no state law guidance, and our federal analogue is not analogous. Applying the second factor, the answer to this important question could either impose future liability on many Texas

14

No. 17-41206

businesses or preclude Texans from relying on an important anti-discrimination statute. In a prior case addressing these two factors, we have acknowledged that cases like this one—"where important state interests are at stake and the state courts have not provided clear guidance on how to proceed," *Louisiana v. Anpac La. Ins. Co.* (*In re Katrina Canal Breaches Litig.*), 613 F.3d 504, 509 (5th Cir. 2010) (quoting *Free v. Abbott Labs.*, 164 F.3d 270, 274 (5th Cir. 1999))—are candidates for certification.

With respect to the final factor, we perceive no hardship in certifying the question. We can formulate discrete issues for consideration, and the Supreme Court of Texas has been prompt in its responses. (Of course, it has the discretion to decline certification if it disagrees with our analysis of these factors.) When asked at oral argument, neither party presented any reasons not to certify the relevant questions to the Supreme Court of Texas. We thus conclude certification is prudent and appropriate in this case.

Accordingly, we certify the following questions to the Supreme Court of Texas:[17]

> 1. Is a plasma collection center like the one described in Section I of this opinion a "public facility" under Texas Human Resources Code § 121.002(5)?

> 2. If so, would Texas law allow the plasma collection center to reject a "person with a disability," *see* TEX. HUM. RES. CODE § 121.002(4), based on the center's concerns for the individual's health that stem from the disability? What standard would apply to determining whether the plasma collection center properly rejected the person, rather than committed impermissible discrimination under Texas Human Resources Code § 121.003(a)?

We disclaim any intention or desire that the Supreme Court of Texas confine its reply to the precise form or scope of the questions certified.

---

[17] The stipulated facts are set forth in the facts section above, and the style of the case is at the beginning of this opinion.

No. 17-41206

## IV.    Conclusion

We AFFIRM the district court's grant of summary judgment on Silguero's and Wolfe's claims under the ADA. We CERTIFY to the Supreme Court of Texas the questions identified above.



**A True Copy**
**Certified Oct 23, 2018**

*Tyle W. Cayce*
**Clerk, U.S. Court of Appeals, Fifth Circuit**

16