# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

September 10, 2024

Lyle W. Cayce
Clerk

No. 23-10804

_____

American Pearl Group, L.L.C., *a Texas limited liability company*; John Sarkissian; Andrei Wirth,

*Plaintiffs—Appellants*,

*versus*

National Payment Systems, L.L.C.,

*Defendant—Appellee*.

_____

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:22-CV-693

_____

Before Stewart, Duncan, and Engelhardt, *Circuit Judges*.

Per Curiam:[*]

Plaintiff-Appellants American Pearl Group, L.L.C., John Sarkissian, and Andrei Wirth (collectively, "Pearl") appeal the district court's Rule 12(b)(6) dismissal of their claims asserting that Defendant-Appellee National Payment Systems, L.L.C. ("NPS") charged "usurious interest" in violation of Texas law. With respect to Pearl's scheduled interest payments, we

_____

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 23-10804

CERTIFY a question to the Supreme Court of Texas. With respect to the district court's dismissal of Pearl's usury claim regarding its option agreement with NPS, we REVERSE IN PART, VACATE IN PART and REMAND IN PART.

## I.

This appeal arises from the district court's order denying Pearl's motion seeking reconsideration of the district court's dismissal, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, of Pearl's complaint and amended complaint. We review a district court's denial of a motion to reconsider for an abuse of discretion. *Calpetco 1981 v. Marshall Expl., Inc.*, 989 F.2d 1408, 1414 (5th Cir. 1993). An abuse of discretion occurs when, *inter alia*, a ruling is based on an erroneous view of the law. *United States v. Yanez Sosa*, 513 F.3d 194, 200 (5th Cir. 2008). Here, the district court denied Pearl's motion for reconsideration based upon its construction of a Texas statute. The construction of a statute is a question of law, which we review de novo. *Grigg v. C.I.R.*, 979 F.2d 383, 384 (5th Cir. 1992).

Similarly, we review de novo the district court's Rule 12(b)(6) dismissal accepting "all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir.2004) (quoting *Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir. 1999)). To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547, 570 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (internal citations omitted).

No. 23-10804

## II.

### CERTIFICATION FROM THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT TO THE SUPREME COURT OF TEXAS, PURSUANT TO ARTICLE V, § 3–C OF THE TEXAS CONSTITUTION AND RULE 58 OF THE TEXAS RULES OF APPELLATE PROCEDURE

**TO THE SUPREME COURT OF TEXAS AND THE HONORABLE JUSTICES THEREOF:**

### A. Style of the Case

The style of the case in which this certification is made is *American Pearl Group, L.L.C., John Sarkissian, and Andrei Worth, Plaintiffs-Appellants v. National Payment Systems, L.L.C., Defendant-Appellee*, No. 23-10804, in the United States Court of Appeals for the Fifth Circuit. The case is on appeal from the United States District Court for the Northern District of Texas. Federal jurisdiction is provided by 28 U.S.C. § 1332. Texas law governs Pearl's usury claims.

### B. Background[1]

At all relevant times, Pearl and NPS operated in the credit card payment processing industry. Credit card transactions require information transfers between an issuing bank, which extends credit to the cardholder, and an acquiring bank, which maintains the accounts of merchants who have agreed to accept electronic payments from customers. Involved in this process are the acquiring/sponsor banks ("Banks"), payment processors

---

[1] Unless otherwise indicated, the factual information is taken from the amended complaint and the district court's December 20, 2022 and July 5, 2023 opinions. *See* Record on Appeal ("ROA") 380–401; ROA.353–365; ROA.655–667.

("Processors"), merchants, independent sales organizations ("ISOs"), and Sub-ISO/resellers.

ISOs work as intermediaries between merchants and Service Providers. After being qualified and registered by credit card companies such as Visa and MasterCard, ISOs enter into agreements with Processors and Banks (collectively, "Service Providers"), pursuant to which ISOs obtain and submit merchant processing applications to Service Providers. Service Providers then pay the ISO a percentage of the transactions that the Service Providers process and settle for each merchant referred by that ISO. The ISO continues to receive a portion of future transaction fees for as long as the merchant continues to process transactions with the ISO. These payments are called residuals.

In providing their services, ISOs sometimes partner with Sub-ISOs. When this occurs, the Sub-ISO typically handles the sales component of the ISO's role while the ISO provides "back-office" services and customer support. And the Sub-ISO receives a portion of the revenues that the ISO receives from Service Providers and related fees. For purposes of this litigation, NPS acted as an ISO with Pearl as its Sub-ISO.

Organized on September 11, 2017, Pearl has acted as both a registered ISO and an Sub-ISO to NPS and other registered ISOs. On October 16, 2017, Pearl executed its ISO Agreement with NPS, agreeing to serve nonexclusively as one of NPS's Sub-ISOs.[2] As part of the transaction, NPS leased equipment to Pearl. Approximately a year later, Pearl encountered financial difficulties in paying NPS's invoices for equipment leases, allegedly as part

---

[2] On May 22, 2019, Pearl and NPS entered into a Second Amendment to the 2017 ISO agreement. *See* ROA.478–485.

of a concerted scheme by NPS to induce Pearl's financial distress and, eventually, agreement to accept debt financing from NPS.[3]

Because resulting cash-flow problems (attributed to NPS's actions) would have rendered it without sufficient funds to maintain its operations, Pearl borrowed $375,100.85 from NPS (the "NPS Loan") on May 8, 2019.[4] The $375,100.85 sum was to be repaid with interest over 42 months, ending in October 2022.[5] With the addition of interest, Pearl owed NPS a total of $684,966.76.[6] Although the NPS Loan Agreement does not articulate an exact percentage rate of interest, an attached payment schedule denoted each payment's allocations toward principal and interest.[7]

The NPS Loan was secured by Pearl's residuals portfolio and incorporated an agreement (the "Option Agreement") granting NPS an irrevocable option to acquire the future residual payment rights for a portion of the merchants in Pearl's residuals portfolio.[8] The NPS Loan and Option Agreements were executed simultaneously, with the Loan Agreement identifying the Option Agreement as a condition precedent of NPS's loan obligation. *See* NPS Loan Agrmt. § 4.1. The Option Agreement provides for two payments from NPS to Pearl: (1) $16,309 to be paid upon the execution of the Option Agreement, and (2) $32,617 to be paid if and when NPS exercised the

-----

[3] NPS's operations also include making loans to Sub-ISOs and other ISOs. According to Pearl, these loans typically are secured by the ongoing residual income streams that the borrower receives from NPS, other ISOs, and/or Service Providers.

[4] *See* ROA.389–390.

[5] *See* ROA.445–446.

[6] *See* NPS Loan Agrmt. (ROA.427–477); *see also* ROA.515.

[7] The NPS Loan was fully repaid, as scheduled, in October 2022. *See* ROA.445–446.

[8] *See* ROA. 433–435; ROA.459–463.

purchase option granted by the agreement. *See* Option Agrmt., §§ 1.1, 1.3.[9] The $32,617 represents the purchase price of the residual payment rights. *Id.* §§ 1.1-1.4.[10]

Two conditions triggered NPS's right to exercise the purchase option at its sole and absolute discretion:  (1) Pearl's repayment in full of the loan contemplated by the NPS Loan, and (2) an uncured event of default under the Loan Agreement. *Id.* § 1.2.  Section 1.4 of the Option Agreement sets forth the procedure for NPS's selection of merchant accounts to purchase upon exercising the option. Specifically, after exercising the option, NPS was to "identify and select a portion of Merchant accounts in the Portfolio . . . that have generated, over the six (6) consecutive months prior to the exercise of the Option, average monthly Residuals in an amount not less than $20,802 and not more than $21,302 per month." *Id.* § 1.4. Finally, pursuant to Section 2.5 of the Option Agreement, NPS could "freely assign [the Option] Agreement and any rights or obligations [t]hereunder in its sole and absolute discretion." *Id.* § 2.5.[11]

After NPS's offset of Pearl's residuals earlier that month, Pearl sued NPS, on March 25, 2022, seeking a declaration that the NPS Loan and incorporated Option Agreement violate Texas's usury statute, an award of damages, and attorney's fees.  Shortly thereafter, NPS filed a motion seeking dismissal pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  The district court concluded: (1) Because of the "spreading doctrine," the NPS Loan's scheduled interest payments were not usurious; (2) the value of the purchase option was too uncertain to constitute interest; and (3) Pearl had

_____

[9]  *See* ROA.459–460.

[10]  *See* ROA.459–460.

[11] *See* ROA.461.

not adequately alleged a scheme to conceal usury. The district court thus granted the motion, dismissing Pearl's complaint for failure to state a claim upon which relief can be granted, but also granted Pearl leave to amend.

Following amendment of the complaint, Pearl moved for reconsideration of the district court's prior decision. The district court denied that motion, finding no reason to depart from its earlier dismissal rulings. This appeal followed.

## C. Legal Issues

Pearl first challenges the district court's determination that the NPS Loan's scheduled interest payments did not charge usurious interest. Specifically, Pearl contends that the district court erred in its interpretation and application of Texas Finance Code § 306.004, which addresses the calculation of interest rates on commercial loans.

Under Texas law, "interest" means compensation for the use, forbearance, or detention of money. TEX. FIN. CODE ANN. § 301.002(a)(4). Interest that exceeds the amount allowed by law is "usurious interest." TEX. FIN. CODE ANN. § 301.002(a)(17). The essential elements of a usurious transaction are (1) a loan of money; (2) an absolute obligation that the principal be repaid; and (3) the exaction from the borrower of a greater compensation than the amount allowed by law for the use of money by the borrower. *Najarro v. SASI Int'l, Ltd.,* 904 F.2d 1002, 1005–06 (5th Cir. 1990) (citing *Holley v. Watts,* 629 S.W.2d 694, 696 (Tex. 1982)). "The purpose of the usury statute is to penalize those who intentionally charge an interest in excess of that allowed by law." *Pentico v. Mad-Wayler, Inc.*, 964 S.W.2d 708, 714 (Tex. Ct. App.—Corpus Christi 1998).

In this instance, the maximum lawful annual rate of interest is set forth in § 303.009(c) of the Texas Finance Code, which provides: "For a contract made, extended, or renewed under which credit is extended for a business,

7

commercial, investment, or similar purpose," the maximum rate of interest is 28 percent per year. *See* Tex. Fin. Code Ann. § 303.009(c). Importantly, however, though § 303.009(c) establishes an maximum *annual* percentage rate of interest, "usury penalties cannot be imposed merely because a loan's interest rate exceeds the statutory limit in any particular year" of the loan's term. *Pentico*, 964 S.W.2d at 714 (citing *Tanner Dev. Co., v. Ferguson*, 561 S.W.2d 777, 787 (Tex. 1977)); *see also C&K Invs. v. Fiesta Grp., Inc.*, 248 S.W.3d 234, 248 (Tex. Ct. App.—Houston 2007). Thus, under Texas law, "'contracts are tested for usury by spreading the interest over the entire term of the contract.'" *See C&K Invs.*, 248 S.W.3d at 248 (quoting *Armstrong v. Steppes Apts., Ltd.*, 57 S.W.3d 37, 47 (Tex. App.—Ft. Worth 2001) (citing *Tanner*, 561 S.W.2d at 786)). "Spreading" is "defined as a method of allocating the *total* interest provided for in a loan agreement over the full term of the loan." *Pentico*, 964 S.W.2d at 714 (emphasis added).

The parties here *agree* that the NPS Loan's scheduled interest payments are not usurious if the aggregate amount of interest charged, spread over the 3.5-year term of the loan, does not exceed the maximum aggregate amount allowed by law. But the parties *disagree* regarding the formula by which the maximum lawful aggregate amount of interest, calculated at the 28 percent annual rate, is to be determined.

The source of the parties' dispute is certain language found in § 306.004 of the Texas Finance Code, which provides:

**§ 306.004 – Determining Rates of Interest By Spreading**

(a) To determine whether a commercial loan is usurious, the interest rate is computed by *amortizing or spreading, using the actuarial method during the stated term of the loan*, all interest at any time contracted for, charged, or received in connection with the loan.

No. 23-10804

(b) If a commercial loan is paid in full before the end of the stated term of the loan and the amount of interest received for the period that the loan exists exceeds the amount that produces the maximum rate authorized by law for that period, the lender shall:

(1) refund the amount of the excess to the borrower; or

(2) credit the amount of the excess against amounts owing under the loan.

(c) A lender who complies with Subsection (b) is not subject to any of the penalties provided by law for contracting for, charging, or receiving interest in excess of the maximum rate authorized.

Tex. Fin. Code Ann. § 306.004 (emphasis added).[12] Specifically, the parties disagree regarding the meaning and significance of "amortizing or spreading, using the actuarial method during the stated term of the loan."

Pearl relies on that language in arguing that the aggregate amount of interest set forth in the NPS Loan's payment schedule[13] exceeds the lawful maximum rate of 28 percent per year. The district court, however, rejected Pearl's argument, reasoning:

> Under Texas law, courts test commercial contracts for usury by applying the spreading doctrine. Tex. Fin. Code § 306.004 (codifying *Nevels v. Harris*, 129 Tex. 190, 195 (1937)). . . . "[U]sury penalties cannot be imposed merely because a loan's interest rate exceeds the statutory limit in any particular year. *Pentico*, [964 S.W.2d at 714] (citing *Tanner*, [561 S.W.2d at 786]. Instead, Texas courts spread the total contracted interest across the life of the loan and assess it against the total maximum interest that would be allowed. *Id.*

---

[12] Section 306.004 is located in the Texas Finance Code, Title 4 - Regulation of Interest, Loans, and Financed Transaction, Subtitle A – Interest, Chapter 306 – Commercial Transactions, Subchapter A – General Provisions. It was added by Acts 1999, 76th Leg., ch. 62, § 7.18(a), eff. Sept. 1, 1999.

[13] *See* ROA.445–446.

at 714 (citing *Tanner*, [561 S.W.2d at 786–87]. The maximum legal interest is the [total] amount of the loan proceeds multiplied by the allowable rate of interest per year — here, 28% — and multiplied again by the term for repayment. *Pentico*, [964 S.W.2d at 714].

The NPS loan proceeds were $375,100.85 to be repaid with $309,865.91 in interest over 42 months, or 3.5 years. Multiplying the [loan] proceeds and term by 28% yields $367,598.83 as the maximum total amount of interest allowed. The interest contracted for in the NPS loan agreement [$309,865.91] does not exceed the statutory ceiling [$367,598.83], and thus it does not independently support a usury claim against NPS.[14]

To determine the maximum total amount of interest allowable for the NPS Loan, the district court utilized the "spreading" method/formula recognized and applied by the Supreme Court of Texas in *Nevels* and *Tanner*. That is, the district court simply multiplied $375,100.85 (total principal) by .28 (statutory maximum interest rate) by 3.5 (term of loan in years), which yielded a product of $367,598.83. And, because the *total* amount of interest paid pursuant to the NPS loan agreement—$309,865.91—is less than the statutory ceiling amount — $367,598.83—the district court rejected Pearl's contention that the NPS loan agreement charged an usurious interest rate in violation of § 303.009(c) and § 306.004(a) of the Texas Finance Code.

In challenging the district court's methodology, Pearl emphasizes that, since *Nevels* and *Tanner* were decided, in 1937 and 1977, respectively, the Texas Legislature has decreed that the interest rate for commercial loans "[be] computed by *amortizing or spreading, using the actuarial method during*

---

[14] *See* December 2022 Opinion at 8 (ROA.360); *see also* July 2023 Opinion at 10, (ROA.664).

*the stated term of the loan,* all interest at any time contracted for, charged, or received in connection with the loan." *See* Tex. Fin. Code Ann. § 306.004(a) (emphasis added) (enacted in 1999); *see also* Texas Civ. St. Art. 5069–1H.004 (effective Sept. 1997; repealed in 1999). And, though recognizing that "actuarial method" is not defined in § 306.004 or elsewhere in the Texas Finance Code, Pearl argues that we can and should look to other sources to ascertain its meaning, including Black's Law Dictionary, a Texas regulation, the federal Truth in Lending Act, and the Texas Practice Guide. These sources provide, in pertinent part:

### (1) Black's Law Dictionary

Actuarial method -

A means of determining the amount of interest on a loan by using the loan's annual percentage rate to separately calculate the finance charge for each payment period, after crediting each payment, which is credited first to interest and then to principal.

ACTUARIAL METHOD, Black's Law Dictionary (12th ed. 2024).

### (2) Texas Administrative Code

§ 12.33. Debt Cancellation Contracts and Debt Suspension Agreements

(a) Definitions.

(1) "Actuarial method" means the method of allocating payments made on a debt between the amount financed and the finance charge pursuant to which a payment is applied first to the accumulated finance charge and any remainder is subtracted from, or any deficiency added to, the unpaid balance of the amount financed.

*See* 7 Tex. Admin. Code Ann. § 12.33(a)(1) (West. 2024).

No. 23-10804

### (3) Truth in Lending Act

§ 1615. Prohibition on use of "Rule of 78's" in connection with mortgage refinancings and other consumer loans

(d) Definitions

For the purpose of this section—

(1) Actuarial method

The term "actuarial method" means the method of allocating payments made on a debt between the amount financed and the finance charge pursuant to which a payment is applied first to the accumulated finance charge and any remainder is subtracted from, or any deficiency is added to, the unpaid balance of the amount financed.

*See* 15 U.S.C.A. § 1615(d)(1) (West).

### (4) Texas Practice Guide: Financial Transactions

§ 2:49. Interest rate determination—Actuarial method defined

Under the actuarial method, at the end of each unit period, or fraction of a unit period, the unpaid balance is increased by the interest amount earned during that period and decreased by any payment made at the end of that period.

*See* 1 Tex. Prac. Guide Fin. Trans. § 2:49.

Relying on these definitional sources, Pearl argues that § 306.004's reference to "using the actuarial method" must mean that the *total lawful interest amount* for the loan is the *sum* of the interest amounts calculated for *each* payment period, over the life of the loan, based on a *declining* principal balance, *not* the initial total principal amount ($375,100.85) of the loan.[15] Employing that computation methodology, Pearl contends that the total

---

[15] *See* ROA.514–517.

permissible amount of interest for the NPS Loan was $207,277.80, rather than the $367,598.83 determined by the district court, resulting in a legally excessive interest payment of $102,588.11.[16]

In short, Pearl argues that, by virtue of the inclusion of the "actuarial method" language in the usury provisions for commercial loans, the district court should have undertaken the more "complex" spreading calculation advocated by it, rather than the "simple" spreading analysis employed in *Nevels* and *Tanner*. For a number of reasons, we think Pearl's position warrants serious consideration.[17] First, the "spreading" analyses undertaken in *Nevels* and *Tanner* focused on sums, treated as interest, that were withheld at the outset from the loan proceeds (*Nevels*) or paid in advance (of the loan's repayment period) for a particular year of the loan (*Tanner*). Such sums are not at issue here. Furthermore, *Nevels* and *Tanner* addressed "interest-only" loans—loans for which *only* interest was paid during the relevant periods of time—such that there were *no* periodic decreases in the principal balance of the loan for which to account in calculating the maximum total amount of interest permissible over the life of the loan. Finally, unlike here, the debts for which interest was charged in *Nevels* and *Tanner* were secured by interests in real property. *See Nevels*, 102 S.W.2d at 1047–49; *Tanner*, 561 S.W.2d 779–88.

Given this combination of facts, it is not surprising that usury legislation, adopted in 1975 (reportedly to codify *Nevels*), governing loans secured by an "*interest in real property*" provided:

> "[D]etermination of the rate of interest for the purpose of determining whether the loan is usurious . . . shall be made by

---

[16] *See* ROA.517.

[17] *See* Frank A. St. Claire, *The "Spreading of Interest" Under the Actuarial Method,* 10 St. Mary's Law Journal 753, 782–99, n. 182, 812–22 (1979); B. Prater Monning, III, *Usury Implications of Front-End Interest and Interest in Advance*, 29 S.W. L.J. 748 (1975).

No. 23-10804

amortizing, prorating, allocating, and *spreading, in equal parts during the period of the full stated term of the loan*, all interest at any time contracted for, charged, or received, from the borrower in connection with the loan."[18]

Notably, however, usury legislation enacted in 1997 *and* in 1999, addressing the computation of interest rates for commercial loans *and* loans secured by an interest of real property, adopted language different from that included in the 1975 legislation.[19] Specifically, rather than providing for the amortization, or spreading, of interest, *in equal parts during the period of the full stated term of the loan*, in order to determine whether a loan was usurious, as the 1975 legislation did, the 1997 and 1999 enactments instead direct that the "interest rate [be] computed by amortizing or spreading, *using the actuarial method during the stated term of the loan*[.]"[20]    In other words, the

---

[18] *See* Tex. Civ. St. Art. 5069–1.07 (emphases added) (enacted in 1975, repealed in 1997); *see* Acts 1975, 64th Leg., p. 47, ch.26, § 1, eff. Sept. 1, 1975; Acts. 1997, 75th Leg., ch. 1008. § 6(a), eff. Sept. 1, 1997).

[19] *See* Tex. Civ. St. Art. 5069–1C.1.101 (emphasis added) (addressing loans secured by interests in real property) (effective Sept. 1, 1997; repealed in 1999); Tex. Civ. St. Art. 5069–1H.004 (emphasis added) (addressing commercial loans) (effective Sept. 1, 1997; repealed in 1999); Tex. Fin. Code Ann. § 302.101 (effective Sept. 1, 1999 and addressing loans secured by an interest in real property); Tex. Fin. Code Ann. § 306.004(a) (emphasis added) (addressing commercial loans)(effective Sept. 1, 1999).

Regarding the 1997 legislation, enacting Art. 5069-1C1.101 (interest in real property) and Art. 5069-1H.004 (addressing commercial loans), see Acts 1997, 75th Leg., ch. 1396, § 1. Regarding the 1999 legislation, enacting § 302.101 (interest in real property) and § 306.004 (addressing commercial loans), see Acts 1999, 76th Leg., ch. 62, § 7.18(a).

[20] *See also* Tex. Fin. Code Ann. § 302.001(c) (effective Sept., 1, 1999) ("To determine the interest rate of loan under this subtitle, all interest at any time contracted for shall be aggregated and amortized using the actuarial method during the stated term of the loan."); Tex. Civ. St. Art. 5069–1C.001(c) (effective Sept. 1, 1997; repealed in 1999) ("To determine the interest rate of loan under this subtitle, all interest at any time contracted for shall be aggregated and amortized using the actuarial method during the stated term of the loan.").

"*spreading of interest, in equal parts during the period of the full stated term of the loan*" language that was used in the 1975 legislation for loans secured by interests in real property, which reportedly codified *Nevels*, was discontinued.

Still, doubt remains regarding the merit of Pearl's assertion of error. As we have noted, "actuarial method" is *not* defined in § 306.004 or elsewhere in the Texas Finance Code. Nor have we been presented with materials setting forth illuminating legislative history for the 1997 legislation or the 1999 legislation. And Texas jurisprudence uniformly emphasizes that "[u]sury statutes are penal in nature and should be strictly construed." *See, e.g., First Bank v. Tony's Tortilla Factory, Inc.*, 877 S.W.2d 285, 287 (Tex. 1994). Furthermore, "[i]f there is any doubt as to the legislative intent to punish the activity complained of, the doubt must be construed in favor of the lender." *Pentico*, 964 S.W.2d at 714.

"When adjudicating claims for which state law provides the rules of decision, we are bound to apply the law as interpreted by the [relevant] state's highest court." *Barfield v. Madison Cnty., Miss.*, 212 F.3d 269, 271–72 (5th Cir. 2000) (citing *Transcontinental Gas v. Transp. Ins. Co.*, 953 F.2d 985, 988 (5th Cir. 1992)). For this civil matter, that court is the Supreme Court of Texas. Unfortunately, the Supreme Court of Texas has not addressed the meaning and significance of those legislative changes.

In that situation, we generally make an *Erie* guess as to what it most likely would decide is necessary, "mindful that our task is 'to predict state law, not to create or modify it.'" *McMillan v. Amazon.com, Inc.*, 983 F.3d 194, 199 (5th Cir. 2020) (quoting *Herrmann Holdings Ltd. v. Lucent Techs. Inc.*, 302 F.3d 552, 558 (5th Cir. 2002)). In doing so, we may look to the decisions of intermediate appellate state courts for guidance. *Howe ex rel. Howe v. Scottsdale Ins. Co.*, 204 F.3d 624, 627 (5th Cir. 2000). In this instance, however, the interim decisions from Texas's intermediate appellate courts

have either addressed different statutory provisions or not squarely addressed the statutory interpretation issue that is presented here. *See Kennon v. McGraw*, 281 S.W.3d 648, 650–53 (Tex. Ct. App. 2009); *C&K Invs.,* 248 S.W.3d at 238–49; *Armstrong v. Steppes Aparts., Ltd*, 57 S.W.3d 37, 45–48 (Tex. Ct. App.—Ft. Worth 2001); *Torres v. G.R. Overby*, No. 05-99-01250-C, 2000 WL 38217, *2–3 (Tex. Ct. App.—Dallas Apr. 17, 2000) (unpub.); *Pentico*, 964 S.W.2d at 711–719; *Groseclose v. Rum*, 860 S.W.2d 554, 557–58 (Tex. Ct. App.—Dallas 1993).

Under these circumstances, we think it appropriate to consider certifying a question to the Supreme Court of Texas. Under Texas law, "[t]he Supreme Court of Texas may answer questions of law certified to it by any federal appellate court . . . presented with determinative questions of Texas law having no controlling Supreme Court precedent." Tex. R. App. P. 58.1; *see also* Tex. Const. art. V, § 3-c(a) ("The supreme court and the court of criminal appeals have jurisdiction to answer questions of law certified from a federal appellate court."). In assessing the propriety of certification, we consider Texas's certification standards and the following factors:

> (1) the closeness of the question and the existence of sufficient sources of state law; (2) the degree to which considerations of comity are relevant in light of the particular issue and case to be decided; and (3) practical limitations of the certification process: significant delay and possible inability to frame the issue so as to produce a helpful response on the part of the state court.

*See Silguero v. CSL Plasma, Inc.*, 907 F.3d 323, 332 (5th Cir. 2018) (quoting *Swindol v. Aurora Flight Sciences Corp.*, 805 F.3d 516, 522 (5th Cir. 2015)), *certified question accepted* (Oct. 26, 2018), *certified question answered*, 579 S.W.3d 53 (Tex. 2019).

In this instance, the legal question before us is not controlled by existing Supreme Court of Texas precedent. It also is determinative of Pearl's usury claim directed to the NPS Loan's scheduled interest payments. That is, if the methodology advocated by Pearl is correct, the total amount of interest NPS charged for that loan exceeds the legal limit.

The factors that have been identified by our case law also weigh in favor of certification. As discussed, available jurisprudence from the Texas courts lacks clear guidance regarding the proper application of § 306.004(a) of the Texas Finance Code. And the proper interpretation of usury provisions governing commercial loan transactions is unquestionably an important issue of state law that the Supreme Court of Texas apparently has had little opportunity to consider. *Cf. Port Arthur Cmty. Action Network v. Texas Comm'n on Env'l Quality*, 92 F.4th 1150, 1152 (5th Cir. 2024) ("[A]ny Erie guess would involve more divining than discerning." (quoting *McMillan,* 983 F.3d at 202)), *certified question accepted* (Feb. 23, 2024); *McMillan*, 983 F.3d at 202 ("[F]ederal-to-state certification is prudent when consequential state-law ground is to be plowed, such as defining and delimiting state causes of action."), *certified question answered*, 625 S.W.3d 101 (Tex. 2021); *JCB, Inc. v. Horsburgh & Scott Co.*, 912 F.3d 238, 241 (5th Cir. 2018), *as revised* (Nov. 14, 2018) ("Texas has an obvious interest in providing its citizens with a proper and uniform statewide interpretation of [its statute], binding in both state and federal court, which only the Supreme Court of Texas can provide."), *certified question accepted* (Nov. 30, 2018), *certified question answered*, 597 S.W.3d 481 (Tex. 2019); *Louisiana v. Anpac La. Ins. Co. (In re Katrina Canal Breaches Litig.)*, 613 F.3d 504, 509 (5th Cir. 2010) ("[C]ertification may be appropriate where important state interests are at stake and the state courts have not provided clear guidance on how to proceed." (quoting *Free v. Abbott Labs.*, 164 F.3d 270, 274 (5th Cir. 1999)).

No. 23-10804

We also perceive no practical limitations associated with the certification process. We can formulate discrete issues for consideration while also disclaiming any intent or expectation that the Supreme Court of Texas confine its reply to the precise form or scope of the question certified. And, of course, the Supreme Court of Texas has the discretion to decline certification if it disagrees with our analysis of these factors. *See* Tex. R. App. P. 58.1 ("The Supreme Court may decline to answer the question certified to it.") Finally, the Supreme Court of Texas has historically been very prompt in its certification responses.

Given the foregoing, we conclude certification is prudent and appropriate in this case.

D. Question Certified

We certify the following question of law to the Supreme Court of Texas:

> Section 306.004(a) of the Texas Finance Code provides: "To determine whether a commercial loan is usurious, the interest rate is computed by amortizing or spreading, using the actuarial method during the stated term of the loan, all interest at any time contracted for, charged, or received in connection with the loan." If the loan in question provides for periodic principal payments during the loan term, does computing the maximum allowable interest rate "by amortizing or spreading, using the actuarial method" require the court to base its interest calculations on the declining principal balance for each payment period, rather than the total principal amount of the loan proceeds?

We again disclaim any intent that the Supreme Court of Texas confine its reply to the precise form or scope of the legal question we certify. Lastly, in accordance with Rule 58.4 of the Texas Rules of Appellate Procedure, the record for this appeal will not accompany our certification but will be promptly provided upon request.

18

### III.

In addition to challenging the district court's interpretation of Texas Finance Code § 306.004, Pearl also contends that the district court erred in rejecting its usury claim concerning the purchase option conveyed to NPS in the Option Agreement. Specifically, Pearl characterizes the Option Agreement as NPS's "irrevocable bargain purchase" of a portion of Pearl's monthly residual portfolio—allegedly a $832,320 value—for a combined total amount of $48,926. Thus, Pearl argues, the Option Agreement equates to a charge by NPS of additional compensation for Pearl's use of the NPS Loan's proceeds—i.e., interest—in the amount of $783,394. If Pearl's position is correct, the resulting *total* interest to be charged on the NPS Loan, considering the $309,865.83 scheduled interest, is $1,093,259.83.[21]

In evaluating this claim, the district court recognized that "interest need not be a payment of currency," and determined that the parties had characterized the purchase option (granting NPS the irrevocable right to acquire a portion of Pearl's residual payment rights) as compensation for the loan.[22] We additionally note that the NPS Loan identifies execution of the Option Agreement as a "condition precedent" to the Loan. *See* NPS Loan Agreement § 4.11.[23] In other words, if Pearl wanted to borrow money from NPS, it was required to grant the purchase option to NPS *in addition to* paying the interest set forth in the payment schedule.

Even so, the district court rejected Pearl's usury claim regarding the Option Agreement. It reasoned that interest must have a certain dollar value at contract formation—because a contract is evaluated for usury as of its

---

[21] *See* ROA.519–520.

[22] *See* ROA.362–363.

[23] *See* ROA.435.

inception—and that it was impossible to ascertain, on that date, the true dollar value that NPS would receive. The district court elaborated:

> The certainty principle ensures that usury penalties will be strictly construed, applied to only those whose violations of the law can be readily determined.
>
> * * *
>
> "[I]t is impossible" for this Court to ascertain the "true dollar value" to be received by the Defendants as of the time of contract formation . . . because . . . the specific portions of Pearl's portfolio to be acquired . . . were not yet determined[.] Instead, that designation was deferred until the time of exercise, to be made according to parameters set out in the option agreement. One parameter was that selected residuals were to exceed a monthly amount of revenue. Streams of residual income are dynamic by nature, [however,] and it is possible that, depending on attrition within [its] portfolio, Pearl would not have even been able to provide residuals satisfying that requirement. Further, the possibility of attrition makes Pearl's contentions regarding the value of the residuals at the time of the agreement unhelpful in forward-looking determinations of what their value would be at exercise.[24]

Thus, the district court concluded, "[because Pearl has] not explained how the residuals' value at exercise could be predicted at contract formation without doubt and that such amount, minus the purchase price, would certainly be usurious," the Option Agreement "do[es] not satisfy the legal definition of interest and cannot support a claim of usury on the face of the agreement[]."[25]

---

[24] *See* December 2022 Opinion at 9, 11. (ROA.361, 363).

[25] *See* ROA.363.

The district court also found Pearl's assertion that NPS "intentionally structured its agreements with Pearl to conceal a known or suspected usury violation within a complex contractual structure" insufficient to state a plausible "concealed usury" claim.[26] Emphasizing that Pearl "must do more than allege strategic or even nefarious business tactics" and that "[a]n unlawful intent will not be imputed where a lawful one may just as consistently be imputed," the district court reasoned that "Plaintiffs have supported their concealed usury claim only with the allegation that NPS knew the market value of Pearl's residuals and that such value, if considered interest, would be usurious." Thus, the district court concluded: "Taken as true, NPS's knowledge of the value of the assets securing its Loan does not, on its own, create a plausible inference that NPS acted maliciously to charge more interest than is lawful."[27]

Although summary dismissal of Pearl's usury claim regarding the Option Agreement may be warranted, we are not convinced that dismissal at the pleadings stage was appropriate. Rather, we think a second, closer evaluation of the claim and relevant supporting evidence is warranted. *See First Bank*, 877 S.W.2d at 287 (Whether a monetary sum is interest is a question of fact for the jury "when there is any dispute in the evidence as to whether [the sum] is actually for an additional consideration, . . . or is merely a device to conceal usury."); *see also Najarro*, 904 F.2d at 1006 ("In determining whether a loan transaction is usurious, it is substance rather than form that is investigated." (quoting *Fears v. Mechanical & Indus. Technicians, Inc.*, 654 S.W.2d 524, 530 (Tex. App.—Tyler 1983, writ ref'd n.r.e.)); *id.* at 1008 ("[A] charge made for the use, forbearance, or detention of money is interest,

---

[26] *See* ROA.364-365.

[27] *See* ROA.365.

regardless of the label placed upon it or the artfulness with which it is concealed.'").

Although the *full* value of the purchase option was uncertain as of the inception of the Option Agreement, it is far from obvious that a sufficiently concrete value, even if discounted far below the $832,320 proffered by Pearl, could not be established as of the time the Option Agreement was executed in 2019.  This is particularly true considering that the Option Agreement allows NPS, upon exercising the purchase options, a choice of residuals meeting certain minimal requirements.

Nor, moreover, is it apparent that NPS could not have immediately sold/assigned its option, in accordance with section 2.5 of the Option Agreement, to a third party at a substantially higher rate than the amount paid to Pearl.[28]  Additionally, though the record reveals that Pearl lost a substantial portion of its residuals for a time period between May 2019 and May 2020, it is not entirely clear why that happened or that imminent recovery and growth would not have been expected, and factored into, asset valuation at the time the agreements at issue were executed in 2019.  In short, though pretrial dismissal of this usury claim on valuation grounds ultimately may be warranted, e.g., via motion for summary judgment, we think an opportunity for discovery and the submission of relevant evidence should precede that determination.

On remand, the district court also should consider whether the monetary sums (totaling $48,926) that NPS agreed to pay Pearl for the purchase option is "distinctly separate and additional consideration, other than the simple lending of money," such that the purchase option "[is] *not* interest

---

[28] *See* ROA.461.

and thus do[es] not violate the usury laws." *See First Bank*, 877 S.W.2d at 287 (emphasis added) ("Fees which are an additional charge supported by a distinctly separate and additional consideration, other than the simple lending of money, are not interest and thus do not violate the usury laws.") (listing cases concluding certain charges were not interest). The district court's December 2022 opinion raised, but did not decide, this question.[29]

Accordingly, we reverse the district court's Rule 12(b)(6) dismissal of Pearl's claim that the purchase option conveyed to NPS constituted usurious interest, vacate that aspect of the district court's judgment, and remand for further proceedings regarding that claim consistent with this opinion.

## IV.

For the foregoing reasons, we CERTIFY the question stated above to the Supreme Court of Texas regarding Pearl's usury claim directed to the interest charged in the NPS Loan's payment schedule.

We REVERSE the district court's Rule 12(b)(6) dismissal of Pearl's usury claim asserted relative to the purchase option agreement, VACATE the judgment of dismissal IN PART, and REMAND IN PART.

We otherwise retain this appeal pending response from the Supreme Court of Texas and direct the Clerk of Court to place this matter in abeyance pending receipt of that response.

CERTIFIED IN PART; REVERSED, VACATED, AND REMANDED, IN PART.

_____

[29] *See* ROA.363.